**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN COUNCIL OF LIFE INSURERS<br>101 Constitution Avenue NW, Suite 700<br>Washington, DC 20001<br><br>       Plaintiff,<br><br>vs.<br><br>DISTRICT OF COLUMBIA HEALTH<br>BENEFIT EXCHANGE AUTHORITY<br>1100 15th Street, NW, 8th Floor<br>Washington, DC 20005<br><br>MILA KOFMAN, in her official capacity as<br>Executive Director of the District of Columbia<br>Health Benefit Exchange Authority<br>1100 15th Street, NW, 8th Floor<br>Washington, DC 20005<br><br>THE EXECUTIVE BOARD OF THE<br>DISTRICT OF COLUMBIA HEALTH<br>BENEFIT EXCHANGE AUTHORITY<br>1100 15th Street, NW, 8th Floor<br>Washington, DC 20005<br><br>DIANE C. LEWIS, in her official capacity as<br>Chairperson of the Executive Board of the<br>District of Columbia Health Benefit Exchange<br>Authority<br>1100 15th Street, NW, 8th Floor<br>Washington, DC 20005<br><br>VINCENT C. GRAY, in his official capacity<br>as Mayor of the District of Columbia<br>1350 Pennsylvania Avenue NW, Suite 316<br>Washington, DC 20004<br><br>DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue NW, Suite 316<br>Washington, DC 20004<br><br>       Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY<br>JUDGMENT AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

1.      In 2010, Congress enacted the Patient Protection and Affordable Care Act (the "ACA").  Among other things, the ACA mandates that an American Health Benefit Exchange ("Exchange") shall be established in each State and the District of Columbia (the "District"). Each State and the District is given a choice of operating its own Exchange or having the federal government establish and operate such an Exchange. These Exchanges are intended to facilitate the purchase and sale of qualified health plans by individuals and small businesses.

2.      As a matter of federal law, only "qualified health plans" – *i.e.*, plans that offer "minimum essential coverage" as that term is defined by federal law – and certain stand-alone dental plans may be sold on an Exchange.  Other types of insurance, such as life insurance, annuities, retirement plans, long-term care and disability income insurance, and reinsurance, may not be sold on an Exchange.  The ACA seeks to incentivize private insurers to offer qualified health plans on the Exchanges by offering them various benefits, including direct federal subsidies for many of the plans they sell on Exchanges.

3.      Although the ACA appropriated funding to assist States and the District in getting their Exchanges off the ground, it does not allow for the expenditure of federal funds to finance the continued operation of an Exchange.  Instead, the ACA mandates that each Exchange be self-sustaining by January 1, 2015.  To that end, the ACA authorizes States and the District to fund the operation of their Exchanges by charging assessments or user fees to participating health insurance issuers.  Likewise, the federal government has announced that it will fund the Exchanges it operates by charging assessments or user fees to participating health insurance issuers.

4.      In 2011, the District enacted the Health Benefit Exchange Authority Establishment Act (the "Establishment Act"), which declares the District's intent to establish its

own Exchange ("the D.C. Exchange") and establishes an entity designated the Health Benefit

Exchange Authority (the "Authority") to operate that Exchange in accordance with the

provisions of the ACA.  The Establishment Act vested the Authority with limited regulatory

jurisdiction over health insurance issuers that sell "qualified health plans" and "qualified dental

plans."

5.      In addition, the Establishment Act authorized the Authority to fund the D.C.

Exchange's operations by imposing user fees, licensing fees, and other assessments on issuers

that offer qualified health or dental plans in the District.  The Establishment Act did not

authorize the Authority to regulate or to impose fees or assessments on issuers that do not offer

qualified health or dental plans – *i.e.*, on issuers that offer only products such as life insurance,

annuities, retirement plans, long-term care and disability income insurance, and reinsurance.

6.      In the two years since the District decided to create its own Exchange, it has

become clear that the costs of operating the D.C. Exchange will be extraordinary.  In 2015 alone,

the Authority projects that its operating budget will be $28.75 million.  That is nearly *ten times*

the $2.9 million operating budget of the entire insurance bureau of the Department of Insurance,

Securities and Banking, which monitors the solvency of more than 1,300 insurance companies

and nearly 67,000 licensed insurance agents and brokers.  The Authority, by contrast, operates an

Exchange on which only four issuing insurers sell coverage to, at the moment, less than 50,000

enrollees.

7.      In an effort to generate the substantial funding that will be necessary to operate

the D.C. Exchange, on May 22, 2014, the Council of the District (the "Council") enacted the

Health Benefit Exchange Authority Financial Sustainability Emergency Amendment Act of 2014

(the "Emergency Legislation").  The Emergency Legislation amends the Establishment Act to

direct the Authority to fund the operations of the D.C. Exchange by imposing assessments not just on companies that sell qualified health or dental plans on the Exchange, but on every "health carrier" that does business in the District (the "Carrier Fee").  The Carrier Fee will reach not only health and dental plans sold through the Exchange, but also wholly unrelated insurance products that are not and cannot be sold on the D.C. Exchange.  For example, according to Defendants, the Emergency Legislation empowers the Authority to impose the Carrier Fee on all disability income insurance sold in the District even though disability income insurance is not a "qualified health plan" that can be offered on the D.C. Exchange.  Similarly, Defendants have indicated that the Carrier Fee will also be assessed on dental plans that the ACA allows to be sold on an Exchange but that the Authority is currently excluding from the D.C. Exchange.

8.      The Emergency Legislation empowers the Authority to assess and collect the Carrier Fee even from issuers that do not sell *any* products eligible for sale on the D.C. Exchange.

9.      The only limitation the Emergency Legislation imposes on the Authority's power to assess the Carrier Fee is that the total amount assessed may not exceed reasonable projections of the costs to operate the Authority.

10.     Under Defendants' interpretation of the Emergency Legislation, carriers subject to the fee will be required to fund the operations of the D.C. Exchange even if they receive no benefits from its operation.  In effect, the Emergency Legislation imposes "user fees" on non-users, *i.e*, on companies and products that are ineligible for participation on the Exchange and beyond the Authority's power to regulate.

11.     By seeking to fund the operation of the D.C. Exchange in this manner, the District is seeking to obligate certain companies to endow a State-sponsored marketplace for the

exclusive use of a small subset of health insurance issuers.  There is no other Exchange – state or federal – that will be funded in this manner.  Instead, both the States and the federal government have imposed fees only on products that can be sold on the Exchanges, which give rise to benefits under the ACA such as federal subsidization of premiums.

12.     Defendants have announced that they intend to issue assessment notices pursuant to the Emergency Legislation imminently.  Plaintiff American Council of Life Insurers ("ACLI") brings this action seeking a declaratory judgment that the Emergency Legislation is unconstitutional and preempted by the ACA.  Plaintiff also seeks an injunction enjoining Defendants from assessing and collecting the Carrier Fee as currently threatened by the Authority.

## THE PARTIES

13.     ACLI is a trade association with approximately 300 member insurance companies operating throughout the United States, including in the District.  ACLI advocates in federal, state, and international forums for public policy that supports the industry marketplace and the 75 million American families that rely on life insurers' products for financial and retirement security.

14.     ACLI's members sell numerous products that are not and cannot be sold on the D.C. Exchange.  Such products include life insurance, annuities, retirement plans, long-term care and disability income insurance, and reinsurance.  Defendants have asserted that many of these products will be subject to the Carrier Fee, regardless of the fact that they are not and cannot be sold on the D.C. Exchange.  ACLI has associational standing to pursue claims for injunctive and declaratory relief on behalf of its members.  ACLI's members have standing to sue in their own right.  The protection of its members from unwarranted and unlawful industry fees is germane to

the purpose of ACLI.  Individual participation of ACLI's members is not required to determine whether the Carrier Fee violates federal law or the United States Constitution; nor is it required to provide injunctive and declaratory relief to ACLI and its members.  ACLI thus brings this action on its members' behalf.

15.    The Authority is an instrumentality of the District that is charged with implementing a health insurance exchange program in the District in accordance with the ACA. It is also charged with responsibility for issuing assessments for the Carrier Fee.  D.C. Code § 31-3171.04.

16.    Mila Kofman is the Executive Director of the Authority, and this action is brought against her in that capacity.

17.    The Executive Board of the Authority exercises the powers that are granted to the Authority pursuant to D.C. Code § 31-3171.06.

18.    Diane C. Lewis is the Chairperson of the Executive Board of the Authority, and this action is brought against her in that capacity.

19.    Vincent C. Gray is the Mayor of the District of Columbia.  The Mayor is authorized by statute to "take care that the laws [of the District] be faithfully executed."  D.C. Code § 1.301.76.  Under the Emergency Legislation, the Mayor is empowered to impose penalties and to suspend or revoke certificates of authority or licenses to transact business in the District if an issuer fails to pay the Carrier Fee.

20.    The District is a municipal corporation established by Congress as authorized in the United States Constitution, Art 1, § 8 cl. 17.

## JURISDICTION

21.     This Court has original subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 and 42 U.S.C. § 1983.

22.     This Court has authority to issue a declaratory judgment and "further necessary or

proper relief" pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

23.     Venue is proper in this Court because the actions of Defendants complained of

herein have occurred and shall occur in this district.  28 U.S.C. § 1391(b).

## FACTS

**The ACA: The Patient Protection and Affordable Care Act, as Amended**

24.     The ACA is comprised of the Patient Protection and Affordable Care Act, which

was enacted on March 23, 2010 (Pub. L. No. 111-148, 124 Stat. 119 (2010)), and separate

amendments made pursuant to the Health Care and Education Reconciliation Act of 2010,

enacted on March 30, 2010 (Pub. L. No. 111-152, 124 Stat. 109 (2010)).

25.     The ACA amends and supplements the provisions of Part A of title XXVII of the

Public Health Service Act relating to group health plans and health insurance issuers in the group

and individual markets.  Part A of title XXVII contains the ACA's key reforms to the health

insurance market.  These provisions include the mandatory extension of group health coverage to

children up to age 26, the elimination of annual and lifetime medical benefit limits, and

prohibitions on pre-existing condition exclusions.  42 U.S.C. §§ 300gg-3, 300gg-11, and 300gg-

14.

26.     Although the ACA imposes comprehensive reforms on the health insurance

market, those reforms to do not apply to every kind of insurance that might be characterized as

7

"health coverage" for purposes of state insurance filings.  In particular, the ACA has no

application to what section 2791(c) of the Public Health Services Act defines as "Excepted

Benefit" coverage.  Examples of Excepted Benefit coverage include disability income, worker's

compensation policies, automobile liability insurance, long-term care coverage, fixed indemnity

insurance, and coverage offered as supplemental to Medicare, Armed Forces health coverage, or

certain group health insurance policies.  42 U.S.C. § 300gg-91(c).  Because these plans do not

offer the kind of health coverage that the ACA contemplates, they are wholly outside the scope

of the ACA's regulatory scheme.

27.     The core of the ACA is the "Individual Mandate," which requires individuals to

purchase and maintain comprehensive health insurance coverage ("Minimum Essential

Coverage") or pay a penalty.  26 U.S.C. § 5000A.  Individuals who do not have access to

government-sponsored, employer-provided, or other third-party coverage must purchase

Minimum Essential Coverage from a private health insurance issuer through the private or public

health insurance market.  26 U.S.C. § 5000A(f).

28.     To facilitate the purchase of Minimum Essential Coverage by such individuals,

the ACA mandates that an Exchange shall be established in each State and the District.  If a State

elects not to establish an Exchange, the ACA requires the Secretary to establish and operate a

federally-facilitated exchange in that state (a "Federal Exchange").  Many of the statutory

Exchange standards that govern State Exchanges also apply to the Federal Exchange.

29.     Whether operated by a State, the District, or the federal government, Exchanges

are heavily regulated by the ACA.  States implementing an Exchange must adopt federal

standards and effectuate state laws and regulations that implement such standards.  The ACA

dictates each Exchange's open enrollment periods, governance structure, manner of offer of

coverage, and minimum functions.  The ACA also imposes limitations on how Exchanges may

be funded.  The Secretary of the United States Department of Health and Human Services (the

"Secretary") has ongoing authority to establish standards for the Exchanges.  42 U.S.C.

§ 18031(c), (d).

30.    One of the requirements that the ACA imposes is that health plans offered on an

Exchange must meet the requirements of and be certified as a "Qualified Health Plan."  Qualified

Health Plans are, generally, comprehensive plans that offer "essential health benefits," and that

meet other federal and state regulatory standards.  42 U.S.C. § 18031(a)-(d).  The ACA explicitly

prohibits a State Exchange from offering a health plan that is not a Qualified Health Plan, other

than certain stand-alone dental plans.

31.    Because Excepted Benefit policies do not offer essential health benefits, 42

U.S.C. § 300gg-21, they cannot be certified as Qualified Health Plans and cannot be used to

satisfy the ACA's Individual Mandate to maintain health insurance coverage.  Thus, Excepted

Benefit policies, other than certain stand-alone dental plans, cannot be sold on a State Exchange

and are not subject to regulation by an Exchange.  42 U.S.C. §§ 18021(a), 18031(d)(2)(B).

32.    Section 18031(d)(5)(A) of the ACA provides that "[i]n establishing an Exchange

under this section, the State shall ensure that such Exchange is self-sustaining beginning January

1, 2015, including allowing the exchange *to charge assessments or user fees to participating*

*health insurance issuers,* or to otherwise generate funding, to support its operations." (emphasis

added).

33.    In interpreting section 18031(d)(5)(A), which also applies to Federal Exchanges,

the Secretary has concluded that the federal government may charge monthly user fees only to

issuers that actually sell Qualified Health Plans and stand-alone dental plans on a Federal

Exchange.  45 CFR 156.50(c).  The monthly Federal Exchange fee is equal to the product of the

monthly user fee rate and the monthly premium charged by the issuer for each policy under the

plan where enrollment is through a Federal Exchange.  *Id*.  As the Secretary has explained, this

fee is permissible because of the "special benefits derived" from the ability to sell Qualified

Health Plans on an Exchange.  HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed.

Reg. 13,744, 13,746 (March 11, 2014).

34.     In addition to the District, 14 States have elected to operate an Exchange under

the ACA.  Each of these State Exchanges must develop a self-sustaining financial model by 2015

pursuant to section 18031(d)(5)(A).  Like the federal government, the States that have chosen to

sustain their Exchanges through user fees have imposed such fees only on issuers that actually

sell health and dental plans that can be sold on an Exchange.  No State Exchange has sought to

sustain its Exchange by imposing a fee upon receipts from insurance products that cannot be sold

on that State's Exchange under the ACA.

**The Establishment Act: The District's Health Benefit Exchange Authority Establishment
Act of 2011**

35.     The Establishment Act declared the District's intent to establish its own

Exchange, established and set out the responsibilities of the Authority, and detailed the core

responsibilities of the D.C. Exchange.  The Establishment Act became effective on March 2,

2012.  D.C. Law 19-94; D.C. Code § 31-3171.01 *et seq*.

36.     The Authority is an instrumentality of the District created to effectuate the

purposes of the Establishment Act.  The purposes of the Authority are to: "(1) Enable individuals

and small employers to find affordable and easier-to-understand health insurance, (2) Facilitate

the purchase and sale of qualified health plans, (3) Assist small employers in facilitating the

enrollment of their employees in qualified health plans, (4) Reduce the number of uninsured,

(5) Provide a transparent marketplace for health benefit plans, (6) Educate consumers; and

(7) Assist individuals and groups to access programs, premium assistance tax credits, and cost

sharing reductions." D.C. Code § 31-3171.02. These purposes are wholly unrelated to products

that are not and cannot be sold on the Exchange.

37.    The Establishment Act directs the Authority to undertake a number of activities.

The Authority was required to establish the D.C. Exchange and to certify plans as Qualified

Health Plans that may be offered on the D.C. Exchange. D.C. Code § 31-3171.04(a). The

Establishment Act limits certification eligibility to "health benefit plans" that meet the

requirements of the ACA. D.C. Code § 31-3171.09(a).

38.    A "health benefit plan" is defined under the Establishment Act as "a policy,

contract, certificate, or agreement offered or issued by a health carrier to provide, deliver,

arrange for, pay for, or reimburse any of the costs of health care services." D.C. Code § 31-

3171.01(5)(A). The Establishment Act explicitly excludes Excepted Benefits, which are not

subject to regulation under the ACA, from the definition of "health benefit plan" for all purposes

related to the D.C. Exchange. *Id.* Thus, Excepted Benefit policies cannot be certified as

Qualified Health Plans that can be offered on the D.C. Exchange.

39.    The Establishment Act also established the Health Benefit Exchange Authority

Fund (the "Fund"). The Fund is to be administered by the Authority and "shall be used solely

for the purposes set forth in [the Establishment Act] and the costs of administering [the

Establishment Act]." D.C. Code § 31-3171.03(a).

40.    The Fund shall consist of: "(1) Any user fees, licensing fees, or other assessments

collected by the Authority; (2) Income from investments made on behalf of the Fund; (3) Interest

on money in the Fund; (4) Money collected by the executive board as a result of a legal or other

action; (5) Donations; (6) Grants; (7) All general revenue funds appropriated by a line item in the budget submitted pursuant to section 446 of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 801; D.C. Official Code § 1-204.46), and authorized by Congress for the purposes of the Authority; and (8) Any other money from any other source accepted for the benefit of the Fund."  D.C. Code § 31-3171.03(b).

41.     The Establishment Act provides that "the Authority is authorized to charge, through rulemaking: (A) User fees; (B) Licensing fees; and (C) Other assessments on *health carriers selling qualified dental plans or qualified health plans in the District*, including qualified health plans and qualified dental plans sold outside the exchanges."  D.C. Code § 31-3171.03(e) (emphasis added).

42.     As initially enacted, the Establishment Act did not authorize the Authority to assess carriers that do not sell products that can be sold on the Exchange.  D.C. Code § 31-3171.03(e).

**The Rule: A Notice of Proposed Rulemaking by the Authority**

43.     The ACA provided States with federal grant funds to establish an Exchange.  The District received more than $133 million in federal grant funds to establish the D.C. Exchange.  However, the federal government will not finance Exchange operations after 2014.

44.      The projected costs of operating the Exchange that the Authority has created are enormous.  In 2015 alone, the Authority anticipates that its operating budget will be $28.75 million.  By comparison, the budget of the insurance bureau within the Department of Insurance, Securities and Banking, which is also funded by assessments on insurance issuers, is just $2.9 million.  Despite the Authority's significantly larger budget, the responsibilities of the insurance bureau are much more extensive than the responsibilities of the Authority.  The insurance bureau

monitors the solvency of the more than 1,300 insurance companies operating in the District and the nearly 67,000 licensed insurance agents and brokers.  This bureau also approves all policy forms and premium rates for insurance products sold in the District.  The Authority, by contrast, operates an Exchange that, at the moment, consists of four insurance providers and approximately 50,000 consumers.

45.     After the Establishment Act was enacted, the Authority appointed a "working group" consisting of, among others, health insurance issuers offering Qualified Health Plans on the D.C. Exchange.  The working group was charged with developing a plan to pay for the D.C. Exchange once federal funding ceases in 2015.  The working group proposed that the Authority raise the necessary funds by imposing a "broad" assessment that would extend beyond products sold on the Exchange to other insurance products that are not and cannot be sold on the D.C. Exchange.  The proposed assessment would apply even to issuers that do not sell *any* products eligible for sale on the Exchange and therefore can receive no benefits from the D.C. Exchange's operation.  Consistent with the working group's recommendation, on February 12, 2014, the Authority proposed a rule implementing such an assessment to fund the D.C. Exchange.  61/9 D.C. Reg. 001741 (Feb. 28, 2014).

46.     During the public notice and comment period for the proposed rule, the Authority received multiple comment letters explaining that the assessment contemplated by the proposed rule would be illegal because, under the Establishment Act, the Authority was empowered only to assess issuers that offered qualified health and dental plans that could be sold on the D.C. Exchange.

47.     After receiving comments that its proposed rule was illegal, the Authority abandoned the proposed rule without warning or public notice.  Instead, the Authority sought

13

emergency legislation from the Council to amend the Establishment Act to grant the Authority broader fee assessment powers. The Emergency Legislation was passed by the Council and signed into law on May 22, 2014. D.C. Act 20-329.[1]

**The Emergency Legislation: The Health Benefit Exchange Authority Financial Sustainability Emergency Amendment Act of 2014**

48.     The Emergency Legislation amends the Establishment Act to provide that "the Authority shall annually assess, through a 'Notice of Assessment,' each health carrier doing business in the District with direct gross receipts of $50,000 or greater in the preceding calendar year an amount based on a percentage of its direct gross receipts for the preceding calendar year. These assessments shall be deposited in the Fund." D.C. Code § 31-3171.03(f)(1).

49.     "Health carrier" is defined in the Establishment Act as "an entity subject to the insurance laws and regulations of the District that contracts, or offers to contract, to provide, deliver, arrange for, pay for, or reimburse any of the costs of health care services, including: (A) An accident and sickness insurance company; (B) A health maintenance organization; (C) A hospital and medical services corporation; or (D) Any other entity providing a health benefit plan." D.C. Code § 31-3171.01(6). "Direct gross receipts" means "all policy and membership fees and net premium receipts or consideration received in a calendar year on all health insurance carrier risks originating in or from the District of Columbia." D.C. Code § 31-3171.01(3A).

50.     This new assessment power is granted in addition to, and not in lieu of, the assessment power originally provided to the Authority under the Establishment Act.

_____

[1] The Emergency Legislation is set to expire on August 20, 2014. On June 18, 2014, the Council enacted temporary legislation that reissues the Emergency Legislation ("Temporary Legislation"). D.C. Act 20-356. The Temporary Legislation will take effect following a 30 day Congressional review period and publication of the Temporary Legislation in the District of Columbia Register.

51.     The assessment power granted to the Authority under the Emergency Legislation is virtually unlimited.  The only constraint on the Authority's power to impose assessments is that "[t]he amount assessed shall not exceed reasonable projections regarding the amount necessary to support the operations of the Authority."  D.C. Code § 31-3171.03(f)(2).  Neither the Establishment Act nor the Emergency Legislation places limits on the Authority's ability to expand its operations or structure in a manner that would support any assessment target chosen in its sole discretion.  For the 2015 fiscal year, the Authority plans to generate nearly all of its $28.75 million operating budget through the Carrier Fee.

52.     The Emergency Legislation requires payment of the amount stated in the Notice of Assessment within 30 business days of receipt of such assessment.  D.C. Code § 31-3171.03(f)(3).

**The Emergency Rule Supplementing the Emergency Legislation**

53.     On June 11, 2014, the Authority again invoked "emergency" processes to adopt a rule relating to the Carrier Fee (the "Emergency Rule").  61 D.C. Reg. 6236 (June 20, 2014). The Emergency Rule attempts to implement a restricted appeals procedure for challenging Carrier Fee assessments.  Under the proposed language, an issuer is limited to contesting its classification as a health carrier subject to the Carrier Fee, processing errors, the incorrect application of relevant methodology, or a mathematical error with respect to the assessment. D.C. Mun. Regs. tit. 26-D, § 110.1.  Also, an issuer may contest an assessment only if the amount in dispute is equal to or exceeds one percent of the applicable assessment.  D.C. Mun. Regs. tit. 26-D, § 110.2.  The Emergency Rule does not toll the 30 day period for Carrier Fee payments during the pendency of an appeal.

**The Threatened Assessments Will Be Imminently Imposed And Issuers that Are Assessed Will Lack An Adequate Remedy**

54.     Defendant Kofman, the Executive Director of the Authority, has asserted that the Carrier Fee is a broad-based assessment that will be imposed upon receipts from sales of Excepted Benefit plans.  Defendant Kofman has also stated that assessments will be issued this summer.

55.     The Emergency Legislation provides that "[a]ny failure to pay the assessment shall subject the health carrier to [D.C. Code § 31-1204]."  D.C. Code § 31-3171.03(f)(4).

56.     D.C. Code § 31-1204(a) provides that any insurer that fails to pay an assessment on or before the due date shall be subject to a penalty imposed by the Mayor that is equal to 10% of the assessment plus interest at one-half of 1% per month for the period between the due date and the date of full payment.

57.     D.C. Code § 31-1204(b) provides that if an insurer fails to pay the assessment in a timely manner, the Mayor shall send the insurer a notice of deficiency, and that 10 days after serving the notice, the Mayor may take whatever action he deems appropriate in his discretion, including "suspending or revoking the insurer's … certificate of authority or license to transact business, or any other appropriate action or sanction authorized under the insurance laws for failure to comply with District laws, including referring the matter to the Corporation Counsel for legal action to collect the assessment."

58.     D.C. Code § 31-1204(a) states that the Mayor shall order a refund if an overpayment is made or if the amount is later found to be in error.  However, neither the Emergency Legislation nor D.C. Code § 31-1204 contain administrative procedures to dispute the assessments to be imposed by the Emergency Legislation.

16

59.     Thus, issuers must pay the Carrier Fee or they will be subject to penalties, interest

and/or the potential revocation or suspension of their certificate of authority or license to transact

business.  The circumscribed "appeals" process contained in the Authority's Emergency Rule

does not allow for challenges to the Carrier Fee on the basis of its inconsistency with federal law

or its unconstitutionality, such as those made in this Complaint.

## COUNT I

### (DECLARATORY/INJUNCTIVE RELIEF – THE EMERGENCY LEGISLATION IS PREEMPTED BY FEDERAL LAW)

60.     ACLI realleges and incorporates by reference the allegations set forth in

Paragraphs 1 through 59, above.

61.     The doctrine of preemption is grounded in the authority of Congress to reserve for

itself exclusive dominion over an entire field of legislative concern.  "Conventional conflict pre-

emption principles require pre-emption where compliance with both federal and state regulations

is a physical impossibility, or where state law stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress."  *Boggs v. Boggs*, 520 U.S. 833, 844

(1997) (internal citations omitted).

62.     The ACA provides:  "In establishing an Exchange under this section, the State

shall ensure that such Exchange is self-sustaining beginning January 1, 2015, including allowing

the exchange to charge assessments or user fees to participating health insurance issuers, or to

otherwise generate funding, to support its operations."  42 U.S.C. § 18031(d)(5)(A).

63.     The Emergency Legislation is preempted by the ACA because, *inter alia,* the

ACA does not authorize the District to impose assessments or user fees on the sale of products

that are not sold on the Exchange.  The Emergency Legislation imposes the Carrier Fee on a

carrier's "policy and membership fees and net premium receipts or consideration" without regard

17

to whether the underlying product was, or even could be, sold on the D.C. Exchange.  This result conflicts with the ACA and HHS's interpretation of the ACA; conflicts with, stands as an obstacle to, and frustrates Congress' purposes in the ACA; and is preempted by the ACA.

## COUNT II

### (DECLARATORY/INJUNCTIVE RELIEF – VIOLATION OF THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION)

64.     ACLI realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 63, above.

65.     The Takings Clause of the Fifth Amendment to the United States Constitution states, in relevant part, that "[n]o person shall be … deprived of life, liberty, or property, without due process of law …."  The Fifth Amendment applies to the District.

66.     A governmental user fee that fails to bear a sufficient relationship to the value received or fails to provide a fair approximation of the cost of benefits supplied constitutes a taking within the meaning of the Takings Clause.

67.     The Carrier Fee is imposed without regard to whether the underlying product was, or even could be, sold on the D.C. Exchange, and thus without regard to what, if any, benefit the assessed issuer received from the Exchange.

68.     The Carrier Fee therefore constitutes a taking of property without just compensation in violation of the Fifth Amendment to the United States Constitution.

## COUNT III

### (DECLARATORY/INJUNCTIVE RELIEF – VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION)

69.     ACLI realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 68, above.

70.     The Due Process Clause of the Fifth Amendment to the United States Constitution states, in relevant part, that "[n]o person shall be … deprived of life, liberty, or property, without due process of law …."  The Fifth Amendment applies to the District.

71.     When the government imposes a fee to fund a government benefit, due process requires a sufficient relationship between the target of the fee and the benefit the government seeks to fund.

72.     The Carrier Fee is imposed without regard to whether the underlying product was, or even could be, sold on the D.C. Exchange, and thus without regard to what, if any, benefit the assessed issuer received from the Exchange.  Accordingly, the Carrier Fee bears an insufficient relationship to the government's intended purpose of defraying the regulatory and administrative costs of operating the D.C. Exchange.

73.     The Carrier Fee therefore violates carriers' right to due process as provided for in the Fifth Amendment to the United States Constitution.

## COUNT IV

### (DECLARATORY/INJUNCTIVE RELIEF – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION)

74.     ACLI realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 73, above.

75.     The Fourteenth Amendment to the United States Constitution provides: "[N]or shall any State … deny to any person within its jurisdiction equal protection of the laws."  The principle of equal protection, as applied to the District through the Fifth Amendment, prohibits the District from making unreasonable classifications for assessing fees and other purposes.

76.     The Emergency Legislation creates an unreasonable classification that is not rationally related to the District's objective.  The Carrier Fee is imposed on certain D.C.

businesses without regard to whether the products they sell are, or even could be, sold on the D.C. Exchange.  At the same time, the Carrier Fee is not imposed on other similarly situated businesses in the District that cannot sell their products on the D.C. Exchange.  There is no reasonable basis for imposing a fee on the sale of some products that are not and cannot be sold on the D.C. Exchange while imposing no assessment on the sale of other products that are equally detached from the operation of the D.C. Exchange.

77.     The Carrier Fee therefore violates carriers' right to equal protection as provided for by the Fifth Amendment to the United States Constitution.

## COUNT V

## (DECLARATORY/INJUNCTIVE RELIEF – UNCONSTITUTIONAL DELEGATION)

78.     ACLI realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 77, above.

79.     The Due Process Clause and separation of powers principles inherent in the United States Constitution prohibit the delegation of legislative power to an executive officer or agent absent some intelligible principle that limits and guides the manner in which that power may be exercised. The D.C. Home Rule Act also limits the extent to which the Council may delegate its legislative power.

80.     By delegating to the Authority the power to assess fees on products that are not sold and cannot be sold on the D.C. Exchange, and are beyond the Authority's jurisdiction to regulate, subject only to the condition that such assessments may not exceed reasonable projections of cost necessary to operate the Authority, the Emergency Legislation unlawfully and unconstitutionally delegates to the Authority an arbitrary and unlimited legislative power.

81.     The Emergency Legislation therefore violates the United States Constitution and the D.C. Home Rule Act.

## COUNT VI

## PRELIMINARY INJUNCTION

82.     ACLI realleges and incorporates by reference the allegations set forth in

Paragraphs 1 through 81, above.

83.     A plaintiff may obtain a preliminary injunction if it can demonstrate: (1) that there

is a substantial likelihood it will prevail on the merits; (2) that it is in danger of suffering

irreparable harm during the pendency of the action; (3) that more harm will result to it from the

denial of the injunction than will result to the defendant from its grant; and (4) that the public

interest will not be disserved by the issuance of the requested order.

84.     There is a substantial likelihood that ACLI will prevail on the merits because

ACLI has demonstrated that the Emergency Legislation conflicts with and is preempted by the

ACA and violates the United States Constitution.

85.     ACLI's members are in danger of suffering irreparable harm during the pendency

of the action because: (1) Defendant Kofman has announced that the assessments will be issued

in the summer of 2014, (2) the Emergency Legislation permits the Mayor to impose penalties

and interest, and to revoke or suspend a carrier's certificate of authority or license to transact

business if it fails to pay its assessment within 10 days after receiving a deficiency notice, (3) the

Emergency Legislation does not provide a process for obtaining refunds of amounts paid in the

event the Emergency Legislation is determined unlawful after payment has been made, (4) the

Emergency Rule does not allow for challenges based on the unconstitutionality of the Carrier Fee

or its inconsistency with federal law, and (5)  it is unclear whether carriers subject to the Carrier

Fee will be able to obtain a refund of amounts paid if the Carrier Fees are spent to fund the

operation of the Authority and the D.C. Exchange while this litigation is pending.

86.     More harm will result to ACLI's members from the denial of the injunction than will result to the Authority from its grant because carriers must either risk the forfeiture of any Carrier Fees paid or subject themselves to penalties and/or the revocation or suspension of their certificate of authority or license to transact business.  In contrast, the Authority and the D.C. Exchange will be required to seek funding through means allowable within the confines of the ACA and the United States Constitution.

87.     The public interest will be served by the issuance of an injunction because the public has an interest in ensuring that the Authority and the D.C. Exchange are funded with legal and constitutional funds.  Moreover in the absence of an injunction, the public interest will be disserved by increased costs for products offered by issuers that do not participate in or benefit from the D.C. Exchange, but are still subject to the Carrier Fee.

88.     ACLI requests a preliminary injunction enjoining Defendants from assessing and collecting the Carrier Fee on premiums or other receipts from products that are not sold on the D.C. Exchange.

**CLAIMS FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

That the Court declare that the Emergency Legislation, as construed by the Authority, is unconstitutional and is preempted by the ACA and is thus unenforceable;

That the Court enjoin Defendants from assessing and collecting the Carrier Fee upon "all policy and membership fees and net premium receipts or consideration received in a calendar year on all health insurance carrier risks originating in or from the District of Columbia" rather than a carrier's receipts from the sale of products made on the D.C. Exchange.

That the Court award Plaintiff reasonable attorneys' fees and costs; and

That the Court award such other and further relief as it may deem just and proper.


Dated: July 3, 2014                                    Respectfully submitted,


                                                       /s/_____
                                                       James J. Briody (DC Bar No. 436354)

                                                       Vanessa A. Scott (DC Bar No. 500940)
                                                       Daniel H. Schlueter (DC Bar No. 994106)
                                                       Todd A. Lard (DC Bar No. 484640)
                                                       A.  Pilar Mata (DC Bar No. 992548)

                                                       SUTHERLAND ASBILL & BRENNAN LLP
                                                       700 Sixth Street NW
                                                       Washington, DC 20001
                                                       Telephone: (202) 383-0100
                                                       Fax: (202) 637-3593
                                                       jim.briody@sutherland.com
                                                       vannessa.scott@sutherland.com
                                                       dan.schlueter@sutherland.com
                                                       todd.lard@sutherland.com
                                                       pilar.mata@sutherland.com


                                                       Paul D. Clement (DC Bar No. 433215)
                                                       Erin E. Murphy (DC Bar No. 995953)

                                                       BANCROFT PLLC
                                                       1919 M Street, NW, Suite 470
                                                       Washington, DC 20036
                                                       Telephone: (202) 234-0090
                                                       Facsimile: (202) 234-2806
                                                       pclement@bancroftpllc.com
                                                       emurphy@bancroftpllc.com


                                                       ATTORNEYS FOR PLAINTIFF