**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN COUNCIL OF LIFE INSURERS, | |
| Plaintiff, | Civil Action No. 14-cv-1138 (BAH) |
| v. | Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA HEALTH BENEFIT EXCHANGE AUTHORITY, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

This case raises a constitutional challenge to the funding mechanism enacted by the

District of Columbia to continue the operations of the District of Columbia Health Benefit

Exchange (the "D.C. Exchange") beginning on January 1, 2015. The D.C. Exchange was

established under the auspices of the Patient Protection and Affordable Care Act ("ACA") to,

*inter alia*, "[e]nable individuals and small employers to find affordable and easier-to-understand

health insurance;" "[f]acilitate the purchase and sale of qualified health plans;" "[r]educe the

number of uninsured;" and "[a]ssist individuals and groups to access programs, premium

assistance tax credits, and cost-sharing reductions." Health Benefit Exchange Authority

Establishment Act ("Establishment Act"), D.C. Code § 31-3171.02. Indeed, the D.C. Exchange

currently facilitates access to health care for approximately 50,000 residents of this jurisdiction.

*See* Compl. ¶ 44, ECF No. 1. To ensure sufficient funding for the operations of the D.C.

Exchange when, after December 31, 2014, all federal funding assistance ceases, the District

passed two separate laws, the Health Benefit Exchange Authority Financial Sustainability

Emergency Amendment Act of 2014 (the "Emergency Amendment Act" or "EAA"), D.C. Act

20-356, and the Health Benefit Exchange Authority Financial Sustainability Temporary Amendment Act of 2014 ("TAA"), D.C. Act 20-256, both of which authorize a Health Carrier Assessment (the "HC Assessment") on health insurance issuers doing significant business in the District, even if those issuers do not participate, or sell products eligible for sale, on the D.C. Exchange. *Id.* ¶¶ 45-47.

The plaintiff, American Council of Life Insurers ("ACLI"), a trade association with approximately 300 member insurance companies operating throughout the United States, including the District of Columbia, filed this suit against the District of Columbia, the District of Columbia Health Benefit Exchange Authority (the "Authority") and various D.C. government officials in their official capacities[1] (collectively, "defendants"), alleging that the Emergency Amendment Act violates multiple parts of the U.S. Constitution by authorizing imposition of the HC Assessment on the plaintiff's members when those members do not participate in, or receive any benefit from, the D.C. Exchange.[2] *See* Compl. at 22 ("Plaintiff prays for relief . . . [t]hat the

---

[1] The individuals named as defendants are Mila Kofman, in her official capacity as Executive Director of the Authority; the Executive Board of the Authority; Diane C. Lewis, in her official capacity as Chairperson of the Executive Board of the Authority; and Vincent C. Gray, in his official capacity as Mayor of the District of Columbia.

[2] The Emergency Amendment Act was passed by the D.C. Council on May 22, 2014 and remained in effect for only 90 days, expiring on August 20, 2014. EAA, D.C. Act 20-329, 61 D.C. Reg. 5363 (providing that it "shall remain in effect for no longer than 90 days, as provided for emergency acts of the Council of the District of Columbia in section 412(a) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 788; D.C. Official Code § 1–204.12(a))"); *see also* Pl.'s Mem. in Supp. of Prelim. Inj. ("Pl.'s P.I. Mem.") at 14, n.12, ECF No. 11. On June 18, 2014, the D.C. Council passed the TAA, which became effective on August 8, 2014, after a 30 day Congressional review period, and expires after 225 days, on March 21, 2015. TAA, D.C. Act 20-356 (providing that "[t]his act shall expire after 225 days of its having taken effect"); *see also* Pl.'s P.I. Mem. at 14, n.12. Even though both the Emergency Amendment Act and the TAA were enacted by the time this lawsuit was initiated on July 3, 2014, the Complaint challenges only the Emergency Amendment Act, which is no longer in effect. Indeed, the plaintiff recognized the inevitable expiration of the Emergency Amendment Act in its Complaint, Compl. ¶ 47, n.1, but has taken no steps to amend the Complaint to challenge the TAA, the law currently in effect authorizing the HC Assessment, a deficiency not addressed by the defendants. Rather, the plaintiff simply asks the Court to assume the relief sought applies to both the expired law and the law currently in effect, even though the Complaint only seeks relief from the former. *See* Prelim. Inj. Hr'g Tr. ("P.I. Hr'g") 11:15-21 (The Court: "So part of your injunction is asking me to stop enforcement of the emergency amendment and the temporary legislation. Is that right?" Pl.'s Counsel: "Your Honor, to the extent, yes, that the assessments would come under the temporary legislation rather than the emergency legislation."), ECF No. 35. While the principle is well established that a challenge to an expired law is moot, *see, e.g., Burke v. Barnes*, 479 U.S. 361, 363 (1987) (holding that issues "were mooted when that bill

Court declare that the Emergency Legislation, as construed by the Authority, is unconstitutional and is preempted by the ACA and is thus unenforceable"). The plaintiff has moved, twice, to enjoin preliminarily the defendants from assessing and collecting the HC Assessment on premiums or other receipts from products that are not sold on the D.C. Exchange, *see* Compl., ¶ 88; Pl.'s Mot. for Prelim. Inj. ("Pl.'s P.I. Mot."), ECF No. 11; Pl.'s Emergency Mot. for Prelim. Inj. ("Pl.'s P.I. Emerg. Mot."), ECF No. 32, and the defendants have moved to dismiss the Complaint, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 25. As discussed more fully below, the defendants' motion is granted, the plaintiff's motions are denied, and the Complaint is dismissed.

## II.    BACKGROUND

The plaintiff claims that the HC Assessment on health insurance companies, which do not participate in, or sell products eligible for sale on, the D.C. Exchange, is preempted by the ACA and violates the Takings, Equal Protection and Due Process Clauses of the Fifth Amendment to the U.S. Constitution, as well as the non-delegation doctrine. Evaluation of these constitutional challenges is aided by review of pertinent provisions in the ACA and the Establishment Act, which is the law containing both the amendments—the Emergency Amendment and the TAA

---

expired by its own terms"), dismissal may be avoided with an adequate showing that the law is or will be reenacted in a form that raises the same issues, *see NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 54-55 (2d Cir. 2008) (preemption challenge not moot where reasonable expectation existed that subject of challenge would be reenacted); *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) (action not moot "if there is a reasonably concrete basis to anticipate that the expired rule will be reenacted in a form that will raise the same questions"). In this case, both the Emergency Amendment and the TAA amend the same provision of the Health Benefit Exchange Authority Establishment Act ("Establishment Act"), D.C. Code § 31–3171.03, with identical language, to provide the District's Health Benefit Exchange Authority with the authority to assess health insurance carriers doing significant business in the District. Thus, the Court will construe the Complaint as a challenge to the amendment (the "Challenged Amendment") to the Establishment Act, rather than deem the Complaint moot for expressly seeking relief only from the expired Emergency Amendment Act.

(the "Challenged Amendment") that is at issue.  This statutory review is followed by a summary of the procedural history of this case.

## A.      The Relevant Statutes

### 1.      The ACA

The ACA was enacted to "increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 132 S. Ct. 2566, 2580 (2012).  To this end, the law requires that (1) States create their own Exchange in compliance with federal regulations or that (2) the Secretary create a federally-managed program (a "Federal Exchange") in the State.  Compl. ¶¶ 1, 28.  Only those health insurance plans that meet certain minimum requirements established by federal law are eligible for sale as Qualified Health Plans ("QHPs") on either State or Federal Exchanges.  Generally, QHPs are comprehensive health plans that offer "essential health benefits" and meet other federal and state regulatory standards.  *Id.* ¶ 30 (citing 42 U.S.C. § 18031(a)-(d)).  Plans that do not meet these requirements, called "Excepted Plans," are prohibited from sale on Exchanges. Compl. ¶ 26.  Excepted plans include disability income, worker's compensation policies, long-term care coverage, fixed indemnity insurance, and certain group health insurance policies.  *Id.* (citing 42 U.S.C. § 300gg-91(c)).

The ACA authorizes initial federal funding to the States and the District for the purpose of establishing State Exchanges.  *Id.* ¶¶ 3, 43.  In total, the initial federal funding provided to the States and the District to set up State Exchanges exceeded $4.8 billion.  *See* Pl.'s Mem. in Supp. of Prelim. Inj. Mot. ("Pl.'s P.I. Mem."), at 8 (citing Daniel H. Schlueter Decl. ("Schlueter Decl.") Ex. D, Annie L. Mach, *et al.*, CONG. RESEARCH SERV., R43066, FEDERAL FUNDING FOR HEALTH INSURANCE EXCHANGES 4-5 (2014), ECF No. 11-1).  All federal funding for State Exchanges

ceases, however, after December 31, 2014, at which time the States are expected to operate their Exchanges without federal funding. *See id.*

The same ACA provision, Section 1311(d)(5)(A), 42 U.S.C. § 18031(d)(5)(A), both terminates federal funding assistance "beginning January 1, 2015" and directs States to take responsibility for the "continued operations" of State Exchanges. This ACA provision is the lynchpin to the plaintiff's preemption challenge. *See id.* ¶¶ 3, 29. To ensure adequate funding "to support [the] operations" of State Exchanges, ACA's Section 1311(d)(5)(A) authorizes the States and the District to allow the State Exchanges "to charge assessments or user fees to participating issuers" and "to otherwise generate funding." 42 U.S.C. § 18031(d)(5)(A).

### 2. *District Authorizing Laws*

One year after Congress enacted the ACA, the District opted to create a local Exchange and passed the Establishment Act, D.C. Code § 31-3171.01 *et seq.*, declaring the District's intent to operate the D.C. Exchange. Compl. ¶ 4. The Establishment Act established the Authority and set out the responsibilities of this new entity. *See* D.C. Code § 31-3171.01. First, the Authority is tasked with maintaining the D.C. Exchange, *see* Compl. ¶¶ 35-36, and, as part of this responsibility, it must certify QHPs to be sold on the D.C. Exchange based on the plans' compliance with D.C. and federal regulations. *Id.* ¶¶ 37-38 (citing D.C. Code § 31-3171.04(a)).

Second, the Authority is responsible for the administration of the Health Benefit Exchange Authority Fund (the "Fund"), which was also created by the Establishment Act to finance the D.C. Exchange. *Id.* ¶ 39. The Fund derives monies from multiple sources, including:

(1) Any user fees, licensing fees, or other assessments collected by the Authority;
(2) Income from investments made on behalf of the Fund;
(3) Interest on money in the Fund;
(4) Money collected by the executive board as a result of a legal or other action;
(5) Donations;
(6) Grants;

(7) All general revenue funds appropriated by a line item in the budget submitted pursuant to section 446 of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 801; D.C. Official Code § 1-204.46), and authorized by Congress for the purposes of the Authority; and

(8) Any other money from any other source accepted for the benefit of the Fund.

D.C. Code § 31-3171.03(b); Compl. ¶ 40.  The Establishment Act authorizes the Authority to generate funds "necessary to support the operation of the Authority," D.C. Code § 31-3171.03(e)(2), by charging "(A) User fees; (B) Licensing fees; and (C) Other assessments on health carriers selling qualified dental plans or qualified health plans in the District, including qualified health plans and qualified dental plans sold outside the exchanges," *id.* at (e)(1); *see also* Compl. ¶ 41.

Facing the December 31, 2014 termination of all federal funding, Compl. ¶ 3, and an estimated $28.75 million in operating costs for the D.C. Exchange in 2015, *id.* ¶ 44, the Authority appointed the Financial Sustainability Advisory Working Group (the "Working Group") to develop a plan to fund the D.C. Exchange after federal funding ceased.  *Id.* ¶ 45.  The Working Group "consist[ed] of, among others, health insurance issuers offering [QHPs] on the D.C. Exchange."  *Id.*  After weighing several alternatives, the Working Group ultimately proposed a broad assessment that would apply to health insurance issuers generating significant revenues from businesses in the District, regardless of whether they participated in the Exchange or could sell products on the Exchange.  *See* ¶¶ 45-46.  To confirm its power to generate funds in the manner proposed, the Authority sought emergency legislation from the D.C. Council to amend the Establishment Act to authorize the imposition and collection of the "Health Carrier Assessment."  *Id.* ¶ 47.  As noted, *supra* note 2, both the EAA and the TAA were subsequently enacted to provide this expanded authority to the Authority.

The EAA and its successor, the TAA, amend the Establishment Act to enable the Authority to increase the Fund used to sustain the D.C. Exchange by "annually assess[ing], through a 'Notice of Assessment,' each health carrier doing business in the District with direct gross receipts of $50,000 or greater in the preceding calendar year an amount based on a percentage of its direct gross receipts for the preceding calendar year." D.C. Code § 31-3171.03(f)(1).[3] The EAA and TAA thus expand the Authority's power under the Establishment Act to charge assessments on issuers of health insurance policies that do not participate in the D.C. Exchange, but that generate significant revenues of $50,000 or more from business in the District. *See* Compl. ¶ 50. The Authority's power is, however, constrained in that "[t]he amount assessed shall not exceed reasonable projections regarding the amount necessary to support the operations of the Authority." *Id.* ¶ 51 (quoting D.C. Code § 31-3171.03(f)(2)). The plaintiff alleges that, for the 2015 fiscal year, the Authority plans to generate nearly all of its revenue through the HC Assessment, which is paid by both participating and non-participating health issuers generating substantial revenues from business in the District. *See id.*; Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 10 (noting that participating issuers are expected to pay "the exact same fee . . . no more than .80% of premiums" as the plaintiff's members subject to the HC Assessment), ECF No. 28.

Once notified of an assessment, an assessed health insurance issuer has thirty days to pay the assessment, Compl. ¶ 53, or face penalties, *id.* ¶¶ 55-57 (citing D.C. Code § 31-1204(a)-(b)). Failure to pay the assessment subjects the issuer to a financial penalty "which shall be 10% of

---

[3] The Challenged Amendment provides the following definitions for two key terms: (1) "Health Carrier" is defined as "an entity subject to the insurance laws and regulations of the District that contracts, or offers to contract, to provide, deliver, arrange for, pay for, or reimburse any of the costs of health care services, including: (A) An accident and sickness insurance company; (B) A health maintenance organization; (C) A hospital and medical services corporation; or (D) Any other entity providing a health benefit plan," D.C. Code § 31-3171.01(6); and (2) "Direct gross receipts" mean "all policy and membership fees and net premium receipts or consideration received in a calendar year on all health insurance carrier risks originating in or from the District of Columbia," D.C. Code § 31-3171.01(3A).

the assessment plus interest at one-half of 1% per month for the period between the due date and the date of full payment." D.C. Code § 31-1204. Additional penalties may also be imposed, subject to the Mayor's discretion, upon service of a notice of deficiency. Discretionary penalties may include: "suspending or revoking the insurer's or health maintenance organization's certificate of authority or license to transact business, or any other appropriate action or sanction authorized under the insurance laws for failure to comply with the District's Laws, including referring the matter to the Corporate Counsel for legal action to collect the assessment." D.C. Code § 31-1204. Under an emergency rule adopted by the Authority, assessed parties may appeal an assessment to contest classification as a health carrier subject to the fee, or the calculation of the assessment amount. Compl. ¶ 53; *see* 61 D.C. Reg. 6236 (June 20, 2014); Pl.'s Mem. in Supp. of Mot. for Emergency Prelim. Inj., ("Pl.'s Emerg. P.I. Mem."), at ¶ 6, ECF No. 32.[4] Pursuant to the TAA, the Authority began assessing the HC Assessment on August 18, 2014. *See* Pl.'s Emerg. P.I. Mem. at ¶ 4.

### B.     Procedural History

As noted, *supra* note 2, the plaintiff initiated this suit shortly after passage of both the EAA and the TAA, alleging that the power provided to the Authority in the EAA to assess non-participating issuers to fund the D.C. Exchange is (1) preempted under the Supremacy Clause, by the ACA ("Count I"), *see* Compl. ¶¶ 60-63, and (2) an unconstitutional violation of the (i) Takings Clause ("Count II"), *id.* ¶¶ 64-68, (ii) Due Process Clause ("Count III"), *id.* ¶¶ 69-73, (iii) Equal Protection Clause ("Count IV"), *id.* ¶¶ 74-77, and (iv) the separation of powers principles inherent in the U.S. Constitution and D.C. Home Rule Act, barring delegation of

---

[4] In support of its request for injunctive relief, the plaintiff has highlighted that "[n]either the legislation enacting the [HC Assessment] nor the Emergency Rule authoriz[es] the Exchange to issue a refund of fees paid." Pl.'s Emerg. P.I. Mem. at ¶ 6.

legislative power to an executive officer ("Count V"), *id.* ¶¶ 78-81.[5]  On July 10, 2014, the

plaintiff sought a preliminary injunction barring the defendants from assessing, collecting, or

enforcing the assessment of the HC Assessment on products that cannot be sold on the D.C.

Exchange.  *See* Pl.'s  P.I. Mot.  The day before the hearing on the plaintiff's motion for

preliminary injunctive relief, the defendants filed a motion to dismiss the Complaint for failure to

state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).  *See* Defs.' Mot.  The

Court indicated at the motions hearing that both pending motions would be considered and

resolved together.  *See* Prelim. Inj. Hr'g. Tr. ("P.I. Hr'g") 77:14-16, July 29, 2014, ECF No. 35.

Less than two weeks after the briefing was complete on the defendants' motion to dismiss, the

plaintiff filed a supplemental declaration from a member company that the Authority had issued

assessments, at the rate of 1 percent of 2013 gross receipts and required payment by September

30, 2014.  Pl.'s Mot. to File Supp. Decl., ¶ 3, ECF No. 30.  The day before the assessments were

due for payment, the plaintiff filed a second motion for a preliminary injunction, making

essentially the same arguments posited in its first motion and in opposition to the defendants'

Motion to Dismiss.  *See* Pl.'s Emerg. P.I. Mot.

     Since the defendants' motion to dismiss is granted for the reasons discussed below, the

plaintiff's motions for injunctive relief are denied as moot.

## II.    LEGAL STANDARD

     Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and

plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant

fair notice of what the . . . claim is about and the grounds upon which it rests."  *Bell Atlantic*

---

[5] The plaintiff initially incorporated a request for a preliminary injunction in the Complaint ("Count VI"), but subsequently complied with Local Civil Rule 65.1(c) by filing a separate motion for preliminary injunctive relief. *See* LCvR 65.1(c) ("an application for a preliminary injunction shall be made in a document separate from the complaint"); Pl.'s Mot. Prelim. Inj., ECF No. 11.

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations in original) (citations and internal quotations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"[B]ecause a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage" when no facts are in dispute. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see also Montanans For Multiple Use v. Barbouletos*, 542 F. Supp. 2d 9, 13 (D.D.C. 2008) ("Where the movant bases the motion on a failure to state a claim upon which relief can be granted, the Court may dismiss based on dispositive issues of law."); *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 52 (D.D.C. 1998) *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) (resolving a 12(b)(6) motion to dismiss where "the entire case on review involves only questions of law and does not turn on issues of fact"). When a "complaint properly read, actually presents no factual allegations, but rather only arguments about legal conclusion to be drawn about the agency action . . . the sufficiency of the complaint is the question on the merits, and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226. Therefore, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## III. DISCUSSION

The parties agree that the ACA requires the D.C. Exchange, as well as other State-operated Exchanges, to wean themselves from federal funding by January 1, 2015, Compl. ¶ 3; Defs.' Mem. in Supp. Mot. to Dismiss ("Defs.' Mem.") at 4, ECF No 26-1, but they dispute the constitutionality of the mechanism adopted by the District to raise the necessary funds to continue operation of the D.C. Exchange when federal funding becomes unavailable. The plaintiff seeks a declaratory judgment that the Challenged Amendment to the Establishment Act authorizing the HC Assessment is unenforceable because the ACA preempts and bars this funding mechanism, which the plaintiff contends is also unconstitutional on other grounds.[6] *See*

---

[6] Although the defendants' mention that the plaintiff failed to present "facts relating to ACLI's members specific to this case," Defs.' Mem. at 2, n. 2, they do not expressly challenge or examine the bases for the plaintiff's standing, *see generally* Defs.' Mem.; P.I. Hr'g 6:11-12 (Plaintiff's counsel noting, "I don't think the District is in any way contesting [the associative standing issue]."). The Court does not have that luxury. "[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. FEC*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Where an organization, such as the plaintiff here, "claim[s] representational standing on behalf of [its] members," Compl. ¶¶ 14-15, the organization must show that "[1] [their] members would otherwise have standing to sue in their own right, [2] the interests [they] seek[] to protect are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members." *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1016 (D.C. Cir. 2014) (citation omitted). Thus, the organization must put forward at least one member who "would otherwise have standing to sue in [its] own right," *id.*, which in this case would require that an ACLI member would be subject to the HC Assessment and meet Article III standing requirements, *see Lujan*, 504 U.S. at 560–61; *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002), and also fulfill the remaining requirements for organizational standing. The Complaint states in a conclusory fashion that the plaintiff "has associational standing to pursue claims for injunctive and declaratory relief on behalf of its members" and that "[the plaintiff's] members have standing to sue in their own right," Compl. ¶ 14, without substantiating this assertion with any factual allegations that any ACLI member met all of the criteria necessary to be subject to the HC Assessment, i.e., "a health carrier doing business in the District with direct gross receipts of $50,000 or greater in the preceding calendar year," D.C. Code § 31-3171.03(f)(1). At the preliminary injunction hearing, plaintiff's counsel conceded, in response to the Court's inquiries about the deficiencies in the Complaint regarding organizational standing, that "there's no allegation [in the Complaint] as to [the] specific amount of gross receipts" made by any plaintiff member to demonstrate organizational standing, P.I. Hr'g 7:16-17, but offered to cure this deficiency by filing an amended complaint or supplemental affidavit, *id.* at 6:25-7:5. Subsequently, in opposition to the defendants' motion to dismiss, the plaintiff provided a declaration that one of its members would be subject to the HC Assessment. *See* Pl.'s Opp'n at 11-12 (citing D.C. Code § 3171.03(f) and Patterson Decl. at ¶¶ 3-4) ("Unum . . . is an accident and sickness insurance company, licensed to sell insurance in the District, subject to the District's insurance laws and regulations, D.C. Code § 3171.06 (6), with more than $50,000 in gross receipts from the sale of disability insurance in the District in the current and preceding calendar years."). The plaintiff has therefore demonstrated organizational standing since, *inter alia*, (1) at least one of its members meets the criteria to be subject to the HC Assessment and has therefore shown an injury-in-fact redressable by the relief sought in this suit, (2) the plaintiff is a trade organization whose purpose "is to advocate for public policy that supports its members' marketplace and its members offer products that will be subject to the fee," despite the members not participating in the D.C. Exchange;

Compl., prayer for relief.  First, the plaintiff contends that, under the Supremacy Clause, the

Challenged Amendment is preempted because "[t]he ACA requires the Exchanges be 'self-

sustaining,' which means they must 'generate' funding from their own operations."  *See* Pl.'s

Opp'n at 1.  Notwithstanding this ACA requirement, according to the plaintiff, the Challenged

Amendment gives the Authority the power to impose the HC Assessment on "non-participating

issuers and policies that are not and cannot be sold on the Exchange."  *Id.* (emphasis omitted).

Second, the plaintiff alleges that the Challenged Amendment violates the Takings, Due Process

and Equal Protection Clauses because applying the HC Assessment to non-participating health

insurance issuers confers no benefit on those assessed carriers, whose business has no nexus to

the operations of the D.C. Exchange.  *Id.* at 20-30.  Finally, the plaintiff argues that the

Challenged Amendment violates the non-delegation doctrine for failing to provide the Authority

with adequate standards in exercising its authority to charge and collect the HC Assessment.  *Id.*

at 31-33.  Each of the plaintiff's constitutional challenges is addressed *seriatim* below.

### A.  ACA Does Not Preempt Challenged Amendment

Count I of the Complaint alleges that the Challenged Amendment is preempted because

"the ACA does not authorize the District to impose assessments or user fees on the sale of

products that are not sold on the Exchange."  Compl. ¶ 63.  The plaintiff relies on Section

1311(d)(5)(A) of the ACA, 42 U.S.C. § 1803(d)(5)(A), together with the interpretation of the

ACA by the U.S. Department of Health and Human Services ("HHS"), to assert that the HC

and (3) only injunctive and declaratory relief is sought so individual member participation is not necessary.  *See*
Pl.'s Opp'n at 12.

Assessment, as applied to non-participating issuers, "conflicts with, stands as an obstacle to, and frustrates Congress' purposes in the ACA." *Id.* Review of general preemption principles is helpful before turning to an analysis of the plaintiff's preemption claim.

### 1. *Preemption Principles*

The Supremacy Clause of the U.S. Constitution establishes that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl.2.; *Wyeth v. Levine*, 555 U.S. 555, 584 (2009) (holding that, under the Supremacy Clause, Congress "may impose its will on the States"). The critical issue in a preemption case is whether Congress intended a federal statute to preempt a state law. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) ("'[t]he purpose of Congress is the ultimate touchstone' of pre-emption analysis") (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Congress' intent, if not express, may be inferred from both the language of the statute at issue and the statutory framework. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996).

The D.C. Circuit has outlined "three ways in which a federal statute or regulation can pre-empt state law." *Geier v. Am. Honda Motor Co.*, 166 F.3d 1236, 1237 (D.C. Cir. 1999). First, Congress can enact a statute that contains an express preemption clause, leaving "'no doubt' that federal law prevails." *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D.C. Cir. 2014) (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012)); *see Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008); *Hillman v. Maretta*, 133 S. Ct. 1943, 1949 (2013) ("Under the Supremacy Clause Congress has the power to pre-empt state law expressly."); *Geier*, 166 F.3d at 1237.

Second, "Congress [may] regulate[] the field so extensively that it clearly intends the subject area to be controlled only by federal law," in what is called "field preemption." *Geier*, 166 F.3d at 1237 (internal quotations and brackets omitted). As the Supreme Court explained, "[w]hen Congress intends federal law to 'occupy the field,' state law in that area is preempted . . . [a]nd even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

Finally, "implied or conflict pre-emption [] applies when a state law conflicts with a federal statute or regulation." *Geier*, 166 F.3d at 1237. A finding of implied or conflict preemption still requires the court to determine whether Congressional intent is sufficiently clear for federal law to supersede state law. *Wyeth*, 555 U.S. at 565. Implied preemption may be found where compliance with both state and federal law is impossible, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

These categories of preemption are not "rigidly distinct." *Crosby*, 530 U.S. at 372 n.6 (2000) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, n. 5 (1990)). Since "a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, 'field pre-emption may be understood as a species of conflict pre-emption,'" *Id.* (quoting *Gen. Elec. Co.*, 496 U.S. at 79-80) (citation omitted). Notably, a general presumption against federal preemption of state law exists, particularly in areas traditionally reserved to the States. *Medtronic, Inc.*, 518 U.S. at 485 (directing that courts "start with the assumption that the historic

police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (internal quotations and citations omitted); *California v. ARC Am. Corp*., 490 U.S. 93, 101 (1989); *Biotech. Indus. Org. v. District of Columbia*, 505 F.3d 1343, (D.C. Cir. 2007) ("To overcome the presumption against preemption[], the party asserting preemption must demonstrate 'that the clear and manifest purpose of Congress' supports preemption." (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co*., 514 U.S. 645, 655 (2007))); *Geier*, 166 F.3d at 1237 (noting the presumption, which "courts must consider when invoking the doctrine of preemption," that "in areas where States have exercised their historic police powers (such as the health and safety of their citizens), courts must start with a presumption against preemption, absent a 'clear and manifest purpose of Congress'"). Consequently, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption," since "[t]hat approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2188-2189 (U.S. 2014) (internal quotations and citations omitted)**.** This presumption against preemption may be overcome only if the court finds that the preemptive purpose of Congress was "clear and manifest." *Medtronic*, 518 U.S. at 485; *Albany Eng'g Corp. v. F.E.R.C*., 548 F.3d 1071, 1075 (D.C. Cir. 2008).

Set against these preemption principles, the Court now turns to analysis of the plaintiff's preemption claim.

### 2.  *Analysis of Plaintiff's Preemption Claim*

The plaintiff does not specify the precise type of preemption invoked – express, field or implied – in support of its preemption claim. Nevertheless, express preemption is clearly

unavailable. The ACA amends, in part, the Public Health Services Act, which squarely addresses preemption and provides that: "Nothing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title." 42 U.S.C. § 18041(d); Defs.' Mem. at 13.[7] Express preemption cannot apply because the ACA explicitly recognizes that State laws may be required to carry out the ACA mandate to provide minimum essential health coverage. Similarly, to the extent the plaintiff seeks to invoke "field" preemption by referencing "the authority of Congress to reserve for itself exclusive dominion over an entire field of legislative concern," Compl. ¶ 61, this effort is unavailing. The ACA expressly grants the States the choice of operating their own Exchanges, pursuant to state law, rather than adopt a Federal Exchange, *id.* ¶ 2, plainly undercutting any perceived congressional intent to control the entire field of local Exchanges.

The plaintiff appears to "hedge its bets" and invoke an implied preemption by claiming that the Challenged Amendment "conflicts with, stands as an obstacle to, and frustrates Congress' purposes in the ACA." Compl. ¶ 63. The plaintiff reasons that the ACA requirement for State Exchanges to be "self-sustaining" by January 1, 2015 preempts the Challenged Amendment. Pl.'s Opp'n at 13-14. In the plaintiff's view, this self-sustaining requirement "means [the Exchanges] must 'generate' funding from their own operations" and, therefore, "[r]eaching outside the Exchange to commandeer funds from companies that do not sell products on the Exchange is not consistent with that statutory requirement." *Id.* at 1; *see id.* at 13 ("by its plain terms, the statute requires that an Exchange be able to 'generate' funds from its own operations"). The plaintiff insists that the use in the ACA's Section 1311(d)(5)(A) of the term "self-sustaining" is an over-arching limitation on the funding options available to the States in

---

[7] The plaintiff appears to concede this point, arguing that the lack of express preemption "is not the end of the inquiry" because the state law must comply with rather than conflict with the ACA. Pl.'s Opp'n at 19.

funding local Exchanges, with the result that this section preempts any effort by the District to seek funding outside of the operations of the D.C. Exchange itself. The plaintiff contends that this interpretation of Section 1311(d)(5)(A) is reinforced by: (1) the plain meaning of "self-sustaining," which is defined as "'maintaining or able to maintain oneself by independent effort,'" *id.* at 13 (quoting Merriam-Webster.com, http://merriam-webster.com/dictionary); (2) the express terms of this ACA section, *id.* at 14; (3) the use of the same term "self-sustaining" in another federal statute, the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, *id.*; and, finally, (4) the manner in which Federal Exchanges are operated, *id.* at 14-15.

The defendants, on the other hand, assert that the "plain language of the ACA clearly defeats this claim" because "the ACA specifically grants power to the Authority to generate funding from sources *in addition to* imposing user fees on health insurance companies selling policies through the D.C. Exchange." Defs.' Mem. at 13 (emphasis in original). According to the defendants, the term "self-sustaining" means simply that the State must operate the Exchange independent of federal government funds.

Each party's construction of ACA's Section 1311(d)(5)(A) turns on the meaning of the term "self-sustaining." While the definition of "self-sustaining" is undisputed, the crux of the instant dispute is whether this term as used in ACA limits the manner in which a local Exchange may be funded by the State or, instead, requires the State to fund the local Exchange independently of the Federal government. In other words, does the "self" in "self-sustaining" refer to the Exchange or the State? The plaintiff's arguments on this issue, while forceful, are ultimately unpersuasive.

In considering the parties' respective interpretations of the ACA, the following principles of statutory interpretation are instructive. When dealing with a complex statutory

scheme, like that reflected in the ACA, issues related to particular provisions must be examined in context with the overall statute and as part of "a symmetrical and coherent regulatory scheme." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks omitted); *Wolf Run Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 659 F.3d 1197, 1200 (D.C. Cir. 2011). This means that the court "must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (internal quotations and citations omitted); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466 (2001) ("Words that can have more than one meaning are given content, however, by their surroundings."). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform that analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Thus, the Court begins its analysis with the statutory language and the interpretation of the statute provided in implementing regulations promulgated by an expert agency, before turning to the remaining arguments of the parties.

### *(a) ACA's Purpose and the Plain Language of ACA Section 1311(d)(5)(A)*

As noted, the key ACA provision requiring, as of January 1, 2015, non-federal funding to operate State Exchanges, including the D.C. Exchange, is Section 1311(d)(5)(A), which states in full:

(5) FUNDING LIMITATIONS

(A) NO FEDERAL FUNDS FOR CONTINUED OPERATIONS.—

In establishing an Exchange under this section, the State shall ensure that such Exchange is self-sustaining beginning January 1, 2015, including allowing the Exchange to charge assessments or user fees to participating health insurance issuers, or to otherwise generate funding, to support its operations.

42 U.S.C. § 18031 (d)(5)(A).

The plaintiff focuses on this provision's explicit authorization for the Exchange to "charge assessments or user fees to participating health insurance issuers," 42 U.S.C. § 18031 (d)(5)(A), as reinforcing the meaning of the term "self-sustaining" that the Exchange is limited to raising funds by "*generat*[ing] fees through its actual operations." Pl.'s Opp'n at 14 (emphasis in original). Certainly, this statutory provision makes clear that charging user fees on participating health issuers that sell their products on a State Exchange, is one valid mechanism to generate the necessary funds to operate State Exchanges.

The plaintiff's heavy reliance on the example of "charg[ing] assessments or user fees to participating health insurance issuers," however, discounts the significance of the broader authorization that follows, namely: "to otherwise generate funding" in order to fund the Exchange's operations. With respect to this latter phrase, the plaintiff argues that the Exchange, "not the District as a whole," is authorized "to otherwise generate funding," *id.* at 15, and offers several examples of alternatives to assessments on non-participating issuers that the Exchange could employ to generate funds.[8] Even if the statutory provision at issue speaks to what the Exchange may do, as the plaintiff contends, the latter phrase "to otherwise generate funding" gives States the "green light" to authorize their Exchanges to raise funds "to support [their] operations" in any way that the State believes is necessary. *See* Defs.' Mem. at 13 ("[T[he Authority, in addition to imposing user fees on the several health carriers selling insurance through the D.C. Exchange may 'otherwise generate funding[,] to support its operations.'" (quoting 42 U.S.C. § 18031(d)(5)(A))).

---

[8] The plaintiff suggests, "[f]or instance, an Exchange could [generate funding] by investing its surplus funds, offering services to other Exchanges (call center, computer, etc.), advertising, imposing assessments on purchasers, or operating stand-alone marketplaces (e.g., vision), as some States are contemplating." Pl.'s Opp'n at 17.

The plaintiff contests this reading of the statute, arguing that allowing States to authorize Exchanges to generate funds from outside of the Exchanges' operations violates "multiple canons of contract construction." Pl.'s Opp'n at 16. At the outset, interpretive canons are employed when the meaning or intent of the statutory language is ambiguous. The Supreme Court has observed that interpretive canons "are quite often useful in close cases, or when statutory language is ambiguous. But . . . such 'interpretative canon[s are] not a license for the judiciary to rewrite language enacted by the legislature.'" *United States v. Monsanto*, 491 U.S. 600, 611 (1989) (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)). In this case, ACA's text and purpose make plain that Congress did not intend to limit the exercise of State power in operating State Exchanges. On the contrary, Congress intended in the ACA to encourage States to operate their own Exchanges and to give the States broad authority to provide adequate funding for those Exchanges when federal funding ceased.

The congressional intent is consistent with the purpose of the ACA to increase health care accessibility. *NFIB*, 132 S. Ct. at 2580. A brief perusal of the naming conventions Congress used for the ACA's subchapters makes this purpose obvious. These provisions are titled, for example, "Immediate Actions to Preserve and Expand Coverage," 42 U.S.C. §§ 18001-03; "Available Coverage Choices for All Americans," *id.* at §§18021-63; and "Affordable Coverage Choices for All Americans," *id.* at §§ 18071-84. In support of this goal, the ACA authorizes the States to establish their own Exchanges and encourages this effort by granting more than $4.8 billion to establish State Exchanges. *See* Pl.'s P.I. Mem. at 8 (citing Schlueter Decl. Ex. D, Annie L. Mach, et al., Cong. Research Serv. R43066, FEDERAL FUNDING FOR HEALTH INSURANCE EXCHANGES at 4-5 (2014)). The District exercised this option and elected to establish its own Exchange and received more than $133 million in federal grants to fund its

operations.  Compl. ¶ 43.  The Establishment Act authorizes the Authority to administer the D.C.

Exchange and, as amended with the Challenged Amendment, to collect sufficient funds to ensure

the continued operations of the Exchange after federal funding ceases in January 2015.  Thus,

contrary to the plaintiff's view, the Challenged Amendment furthers the purpose of the ACA and

fulfills the mandate set out in ACA's Section 1311(d)(5)(A) for State Exchanges to function

without federal funding after December 31, 2014.

The plaintiff's construction of the term "self-sustaining" would undermine the viability of

the D.C. Exchange's continued operations, unless rates for D.C. residents obtaining health

insurance on that Exchange were substantially increased, thereby reducing the accessibility to

affordable insurance.  These adverse effects would undermine both the ACA's purpose and the

District's efforts to further that purpose by setting up the D.C. Exchange.  The defendants

pointed out at the motions hearing that should the plaintiff prevail, "essentially the state

exchange in [the] jurisdiction will fail, and, therefore the District of Columbia is [going to] have

to go back to the federal exchange."[9]  The District "will be taking many steps backwards if that's

the result of this motion and that's not . . . what Congress wanted to happen."  *See* P.I. Hr'g

68:18-20.

In the face of clear Congressional purpose in the ACA and the District's effort to fulfill

the mandate of ACA with the Challenged Amendment, the plaintiff responds with reference to

certain canons of statutory construction that reflect a facility with Latinate phrases more than the

---

[9] The D.C. Circuit recently held that the ACA does not allow federal tax credit subsidies for insurance purchased on Federal Exchanges.  *See Halbig v. Burwell*, 758 F.3d 390, 399 (D.C. Cir. 2014) *reh'g en banc granted, judgment vacated*, No. 14-5018, 2014 WL 4627181 (D.C. Cir. Sept. 4, 2014).  This opinion has been vacated pending *en banc* review, but if the holding of *Halbig* were adopted and, at the same time, available funding mechanisms for the D.C. Exchange were curtailed, as the plaintiff urges in this case, such that the D.C. Exchange cannot continue, then the consequences of these combined decisions for D.C. residents may be use of a Federal Exchange for which, under the holding of *Halbig*, no tax credit subsidies are available.  The Supreme Court has granted certiorari on this issue.  *See King v. Burwell*, No. 14-114, 2014 WL 3817533, at *1 (U.S. Nov. 7, 2014) ("The petition for writ of certiorari is granted.").

applicability of those canons here. While these canons are undoubtedly serviceable devices in certain contexts, they are poor weapons to attempt to blow holes through such expressly stated Congressional intent or defeat the plain meaning of ACA's Section 1311(d)(5)(A). The plaintiff contends, for example, that the canon *expressio unius est exclusio alterius* (i.e., "expressing one item of [an] associated group or series excludes another left unmentioned," *United States v. Vonn*, 535 U.S. 55, 65 (2002)), is violated by reading the funding provision in ACA's Section 1311(d)(5)(A) broadly because such a construction renders superfluous the specific authorization to impose fees on "participating issuers." Pl.'s Opp'n at 16. Reliance on this canon is misplaced. The fact that this statutory provision provides an instructive example of a funding mechanism that relies on user fees from participating issuers serves only to highlight that option—and may even mean that option is preferable—without limiting the funding alternatives available to the States when federal funding ceases.

To apply the plaintiff's suggested canon to restrict funding options available to States would violate another principle of statutory construction: namely, not reading an implied negative inference into a statute unless such a meaning is clear. As the Supreme Court recently explained, "[t]he force of any negative implication" created by including one example of funding as opposed to another "depends on context." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013). Indeed, "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it," *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), the negative implication is not warranted. In the context of the ACA, Congress' intent was clear to give the States broad flexibility to operate State Exchanges without limiting the States' authority to employ alternative funding sources. *See Marx*, 133 S. Ct. at 1175 (noting that the canon of *expression unius est exclusion alterius* can be overcome by "contrary indications that

adopting a particular rule or statute was probably not meant to signal any exclusion") (citation omitted).

The plaintiff also argues that reading the phrase "to otherwise generate funding" as granting broad funding authority for State Exchanges would violate the interpretative canons of *noscitur a sociis* (i.e., "a word may be known by the company it keeps," *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 281 (2010) (quotations and citation omitted)), and *ejusdem generis* (i.e., "of the same kind," *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1760 (2013)).  Pl.'s Opp'n at 16.  Taken together these two canons mean that "general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Wash. State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (collecting cases); *see also Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 175 (D.C. Cir. 2006) ("*ejusdem generis*, which limits general terms which follow specific ones to matters similar to those specified" and "[t]he similar doctrine of *noscitur a sociis* teaches that a word is known by the company it keeps") (internal quotations and citations omitted).  These canons may be referenced when "a word is capable of many meanings in order to avoid giving unintended breadth to the Acts of Congress."  *Amgen, Inc. v. Smith*, 357 F.3d 103, 112-13 (D.C. Cir. 2004) (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  While the canon of *ejusdem generis* can be useful, "its force can easily be overcome by evidence of words and circumstances that indicate contrary intention."  4 Arthur Linton Corbin, Corbin on Contracts, § 24.28 (1998).  Thus, in the context of the ACA where Congress was plainly concerned with providing the States with the upmost flexibility in generating the necessary funds to operate State Exchanges when federal funding ceased, these canons are virtually useless.

Given the purpose of the ACA and clear Congressional intent to encourage States and the District to set up and fund their own Exchanges, the plaintiff's restrictive reading of "self-sustaining" to require each State Exchange to generate funds only from the Exchange's own operations, must be rejected. Moreover, as discussed next, the plaintiff's interpretation of this ACA provision is contrary to that given by HHS in this agency's implementing regulations.

### (b) ACA's Implementing Regulations

The parties dispute the import of the ACA's implementing regulations for the proper construction of Section 1311(d)(5)(A). The defendants contend that "the plain reading of the . . . implementing regulations show that Congress and HHS intended to provide the States with broad discretion to develop a wide range of options for funding plans" to ensure that the Exchange could operate after December 31, 2014 when federal funding ceases. Defs.' Mem. at 15. The plaintiff, on the other hand, posits that HHS regulations, "if anything, [] only make more clear that an Exchange must 'generate' funding from its own operations." Pl.'s Opp'n at 18. Review of these regulations shows that the plaintiff's position is simply wrong.

The Final Rule promulgated by HHS to implement the ACA provides significant guidance on a number of issues related to this new, complex law and, in particular, its "direct effects on the distribution of power and responsibilities among the state and federal governments . . . relating to health insurance coverage (that is, for QHPs) that is offered in the individual and small group markets." 77 Fed. Reg. 18310, 18443 ("HHS Final Rule") (March 27, 2012). Any Federalism implications were considered "substantially mitigated because under the statute, States have choices regarding the structure and governance of their Exchanges" and are "not require[d] [] to establish an Exchange." *Id*. Indeed, the Final Rule makes clear that the regulations are intended "*to afford States substantial discretion in the* design and *operation of an*

*Exchange*, with greater standardization provided where directed by the statute or where there are compelling practical, efficiency or consumer protection reasons." *Id*. at 18311 (emphasis supplied). This emphasis on State discretion in administering the operations of State Exchanges is reflected throughout the HHS Final Rule because "States are best equipped to adapt the minimum Exchange functions to their local markets and the unique needs of their residents," due to the States' "significant experience performing many key functions." *Id.* at 18313. Consequently, "where possible," HHS "finalized provisions of the proposed rule that provided significant discretion for States to go beyond the minimum standards in implementing and designing an Exchange." *Id.*

The HHS Final Rule further addresses the Federalism implications of the ACA and implementing regulations, observing that "[b]ecause States have flexibility in designing their Exchange, State decisions will ultimately influence both administrative expenses and overall premiums." *Id*. at 18443. With respect to the funding of State Exchanges, the rule describes the breakdown of funding sources between the Federal and State governments, such that "much of the initial costs to the creation of Exchanges" would be funded by federal grants and "[a]fter this time, Exchanges will be financially self-sustaining with revenue sources at the discretion of the State." *Id*. The HHS Final Rule states that "[c]urrent State Exchanges charge user fees to issuers," *id*., but does not indicate that a State's discretion in tapping "revenue sources" is in any way limited to such user fees.

Moreover, the HHS Final Rule's discussion of the specific regulation implementing ACA's Section 1311(d)(5)(A) is notable in the agency's responses to comments recommending non-approval of State plans absent "a clear plan to achieve financial sustainability" and "specific recommendations on how Exchanges should generate revenue." *Id*. at 18322-23. The agency

rejected the invitation in the comments to impose restrictions on States' funding options for State Exchanges.  Instead, the HHS Final Rule states that the "ACA directs Exchanges to be self-sustaining and provides flexibility for Exchanges to generate support for continued operation in a variety of ways, such as through user fees." *Id*. at 18323.  Consequently, in accord with the statutory terms, the regulations "do not limit Exchanges' options in the final rule by prescribing or prohibiting certain approaches." *Id.*  On the contrary, maximum flexibility was provided because "user fees parameters, as well as the need for other revenue-generating strategies, may vary by State depending upon several factors such as the number of potential enrollees and the Exchange's operational costs." *Id*.

Several comments and responses are particularly pertinent to the instant challenge to the District's funding mechanism for the D.C. Exchange.  In response to "concerns about specific approaches for generating revenue, such as a provider or general tax," the agency described "Exchange flexibility in funding ongoing operations" as "critical," and observed "that the ability to pursue specific funding strategies may vary by State." *Id.*  Rather than bar any funding option, the agency merely "encourage[d] Exchanges to consider the implications of various fee structures on all stakeholders before making a selection" and, again, stressed "that the Exchange has discretion to set parameters related to assessments." *Id.*

Another comment addressed "recommendations regarding the types of issuers that should be subject to any assessments established by the Exchange," with "the majority of commenters advocat[ing] for a broad-based approach in which all issuers would be subject to the assessment" and "[f]ewer commentators recommend[ing] a narrower approach," in which "certain plans, such as excepted benefit plans, [would] be excluded." *Id.*  Other than urging that the "Exchange should identify the issuers that are subject to any user fees or other assessments, if applicable,"

*id.*, the agency left the option of imposing assessments on non-participating issuers up the States. Indeed, the agency's response indicates that issuers subject to fees or assessments "could include all participating issuers . . . or a subset of issuers identified by the Exchange," or "an Exchange could exempt certain issuers from assessments." *Id.* The agency stressed that "Exchange discretion is important with respect to issuer participation so that Exchanges can consider a broad range of user fee and assessment alternatives." *Id.*

Consistent with HHS' explanations and responses to comments discussed in the Final Rule, the final regulation regarding "Financial support for continued operations," codified at 45 C.F.R. § 155.160, requires that each State "ensure its Exchange has sufficient funding in order to support its ongoing operations beginning January 1, 2015," *id.* at § 155.160 (b), and provides that "States may generate funding, such as through user fees on participating issuers, for Exchange operations," *id.* at § 155.160 (b)(1); *see also* HHS Final Rule, 77 Fed. Reg. at 18322. The plaintiff, again, seizes on "[t]he specific example given – user fees" as confirmation "that a 'self-sustaining' Exchange is one that is able to 'generate' its own funding through its own operations." Pl.'s Opp'n at 18. To the contrary, an example cannot have the effect of swallowing the whole provision, as the plaintiff urges. The words "such as" preceding the example have meaning, and indicate that the example that follows is not exclusive but only an available option. *See D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) (It is a "cardinal rule that, if possible, effect shall be given to every clause and part of a statute.").

The implementing regulations for the ACA, generally, and Section 1311(d)(5)(A), in particular, make amply clear that States were afforded the utmost flexibility in determining how to fund State Exchanges rather than, as the plaintiff urges, limited in how they may raise the funds to operate their Exchanges. *See* Defs.' Mem. at 14.

### *(c)* *Use of "Self-Sustaining" Term in IOAA*

The plaintiff also looks to the use of the term "self-sustaining" in an entirely different federal statute, the IOAA, to support its position that Congress' directive that the "State shall ensure that such Exchange is self-sustaining beginning January 1, 2015" means that the D.C. Exchange must generate funding from its own operations. This argument misses the mark.

The IOAA, enacted over sixty years ago in 1952, admonishes federal agencies to recover the cost of providing services and purports to authorize agency discretion in setting fees. This statute provides, in full, that "[i]t is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation) to a person (except a person on official business of the United States Government) is to be *self-sustaining to the extent possible*." 31 U.S.C. § 9701(a) (emphasis added). "The IOAA describes only in the most general terms how this desideratum of agency self-sufficiency is to be accomplished; agencies are statutorily instructed to be fair in imposing any fee regime and to consider such factors as costs to the Government, the value of the service to the recipient, the public policy or interest being served, and 'other relevant facts.'" *Cent. & S. Motor Freight Tariff Ass'n v. United States,* 777 F.2d 722, 724 (D.C. Cir 2014) (quoting 31 U.S.C. § 9701 (b)(2)(A-D)).

Significantly, the IOAA is interpreted "narrowly to avoid constitutional problems." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974); *see also Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345 (1974). Specifically, Federal agencies may charge fees "for a service that confers a specific benefit upon an identifiable beneficiary," *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1180 (D.C. Cir. 1994), but over-charging beyond "value to the recipient" would exceed the Congressional authorization set out in the IOAA and amount to an improper tax, *NCTA*, 415 U.S. at 342-43.

The IOAA is nowhere referenced in the ACA, which does not make this "sense of Congress," 31 U.S.C. § 9701(a), applicable to the States or State Exchanges. Indeed, the plaintiff concedes, as it must, that the IOAA applies to federal agencies and not to State Exchanges. Pl.'s Opp'n at 14. Nonetheless, the plaintiff insists that because "self-sustaining" has an acquired meaning as used in the IOAA, that same meaning must apply to the use of the term "self-sustaining" in the ACA. *See id.* As an initial matter, while a standard principle of statutory interpretation is that identical phrases appearing in the *same* statute ordinarily bear a consistent meaning, *see Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007), it cannot be presumed that the same phrase in *different* statutes share the same meaning. Indeed, the Supreme Court has expressly cautioned that "[w]hen conducting statutory interpretation, the Court "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009) (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)); *see also Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 253-54 (2010) (holding that construction of statute referring to "prevailing party" was not governed by "[o]ur 'prevailing party' precedent" because statute at issue contained different terms).

Moreover, the plaintiff's argument that the same constraints placed by the IOAA on Federal agencies also apply to State Exchanges because the same term "self-sustaining" is used in both the IOAA and the ACA stretches the reach of the IOAA too far. The ACA directive that State Exchanges be "self-sustaining" does not involve the appropriation or taxing powers of Congress and, in fact, is triggered by the cessation of *any* federal funding by January 1, 2015. Thus, the ACA raises none of the same constitutional concerns over exceeding the fee-for-service authorization in the IOAA that requires the latter statute to be read narrowly. Instead, the

Court looks to the text of the ACA and the context in which that term is used to discern its meaning. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("the meaning of statutory language, plain or not, depends on context"); *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013) ("always, [] begin with the text of the statute"). In this regard, the statutory test and purpose of the ACA controls the proper interpretation of the term "self-sustaining" and takes precedent over use of the same term in an entirely different statute and context.

### (d) Funding of Federal Exchanges Is Irrelevant

Finally, the plaintiff argues that its "interpretation of the statute is consistent with HHS' own actions in setting up the funding mechanism for the Federal Exchanges, which impose fees solely in relation to products actually sold on such an Exchange." Pl.'s Opp'n at 14. The plaintiff summarily states that the operations of the Federal Exchanges supports the interpretation that "self-sustaining refers not to the need for States to sustain their Exchanges without federal funding . . . but rather to the need for Exchanges to sustain themselves through their own operations." *Id.* at 15.

The manner in which Federal Exchanges are operated is not the appropriate lens through which to view Congress' intent regarding how States may exercise their discretion and authority to fund State Exchanges. Federal Exchanges may provide a model for State Exchanges but that is a far cry from the plaintiff's claim that States are restricted to that model. Whatever funding limitations or requirements Congress may impose on Federal Exchanges does not necessarily extend to the States. As discussed, *supra*, in Part III.A.2(a), Congress plainly gave the States the flexibility in ACA's Section 1311(d)(5)(A), to determine how their local Exchanges would

"otherwise generate funding to support [their] operations" and the States are not limited to user fees or assessments on participating issuers.

*        *        *

The plaintiff has utterly failed to overcome the "presumption against preemption." *Biotech. Indus. Org.*, 505 F.3d at 1351. Rather than "demonstrate that the clear and manifest purpose of Congress supports preemption," *id.*, the plaintiff has strained to use the term "self-sustaining" in ACA's Section 1311(d)(5)(A) as a hook to pull in the requirements of the IOAA and apply those same limitations to the States' funding options for State Exchanges. The text and context in which "self-sustaining" is used in this ACA provision, however, allows the States to slip off any line tying this statute to the IOAA.

Moreover, the "case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 167 (1989) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984)) (alterations in original). As the defendants note, "[h]ere, not only did Congress demonstrate its 'awareness' of the operation of state and local law in the regulation of the health-insurance industry in the ACA, it encouraged a collaborative approach, detailing ways in which States could generate funding to operate their Exchanges." Defs.' Mem. at 17.

Accordingly, the ACA does not preempt the Challenged Amendment, as the ACA reflects the intent of Congress for the States to have broad flexibility to implement and operate State Exchanges.

**B.      The Challenged Amendment Does Not Violate Other Constitutional Provisions**

In addition to arguing that the Challenged Amendment is preempted by the ACA under the Supremacy Clause of the U.S. Constitution, the plaintiff attacks the Challenged Amendment as an unconstitutional violation of (1) the Takings Clause of the Fifth Amendment, in Count II, Compl. ¶¶ 64-68; (2) the Due Process Clause of the Fifth Amendment, in Count III, *id.* ¶¶ 69-73, (3) the Equal Protection Clause of the Fifth Amendment, in Count IV, *id.*¶¶ 74-77, and (4) the separation of powers inherent in the U.S. Constitution, due to an alleged improper delegation of legislative power to an executive agency, in Count V, *id.* ¶¶ 78-81.  These claims also fail, for the reasons discussed below.

### 1.      Takings Clause Claim

Count II of the Complaint alleges that the HC Assessment constitutes a taking of property without just compensation, in violation of the Fifth Amendment to the U.S. Constitution. Compl. ¶ 68.  The Takings Clause applies to the States as well as the federal Government, *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 236 (1897), and provides that private property shall not "be taken for public use, without just compensation."  U.S. CONST. amend. V. Thus, the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power."  *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 314 (1987); *see also Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985) ("The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.").  Consequently, "[w]hen the action of the [] government effects a 'taking' for Fifth Amendment purposes, there is no inherent constitutional defect, provided just

compensation is available." *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 690 (D.C. Cir. 2000).

The plaintiff alleges that the Challenged Amendment amounts to an unconstitutional taking because the HC Assessment "is imposed without regard to whether the underlying product was, or even could be, sold on the D.C. Exchange, and thus without regard to what, if any, benefit the assessed issuer received from the Exchange." Compl. ¶ 67. In the plaintiff's view, the HC Assessment is a user fee imposed on the plaintiff's members that "is constitutional only if there is a meaningful nexus between the fee imposed and the benefits supplied in return." Pl.'s Opp'n at 21. Under this articulation of the applicable constitutional standard, the plaintiff contends, the District has "failed" to "demonstrate some meaningful nexus between those it discretely burdens for an assessment and the benefits that flow from what the assessment funds." *Id.* at 23.

The defendants counter that the HC Assessment is not a "user fee" but rather merely a monetary obligation and, as such, "cannot violate the Fifth Amendment Takings Clause." Defs.' Mem. at 19. If the Takings Clause does apply to the monetary exaction on non-participating issuers subject to the HC Assessment, the defendants posit that the District need only show "the assessment[] imposed on health insurance companies doing business in the District is 'reasonably related' to the benefits of the D.C. Exchange under the ACA." *Id*. at 21. Contrary to the plaintiff's conclusion, the defendants assert that the HC Assessment meets this standard and, in any event, "[t]here is a meaningful nexus between the assessments to be issued by the District and the benefits that ACLI's members will receive with a successful and viable D.C. Exchange." Defs.' Reply in Supp. Mot. Dismiss ("Defs.' Reply") at 10.

In short, the parties fundamentally disagree about whether the HC Assessment is a user fee or, instead, a form of monetary exaction immune from the Takings Clause and, even if the HC Assessment is subject to the Takings Clause, what the applicable analytical standard is and whether the HC Assessment would meet that standard and comport with the Takings Clause.

At the outset, before turning to the areas of disagreement between the parties, the Court notes one issue on which both parties agree: the HC Assessment is not a tax. Pl.'s Opp'n at 23 n.19 ("[a]t the hearing on Plaintiff's motion for preliminary injunction . . . the District concede[d] that the [HC Assessment] is not a tax") (citing P.I. Hr'g 54:24: Defense counsel stating: "it's not a tax.")).[10] The Court will therefore assume for purposes of resolving the pending motion that the HC Assessment is not a tax.[11]

---

[10] The plaintiff explains, and the defendants do not dispute, that D.C. law precludes the characterization of the assessment as a tax because local law limits taxes on insurance companies to a 2 percent premium tax. Pl.'s Opp'n at 24 n.19 (citing D.C. Code § 47-2608 (a)). While D.C. Code § 47-2608 (a)(1)(B) authorizes, in addition to the premium tax, the imposition of "fees and charges provided by the insurance laws of the District including amendments made to such laws by this chapter," counsel for the defendants stated at the motions hearing that the HC Assessment does not fall under this provision. P.I. Hr'g. 55:14-16. Notably, the parties' agreement on this issue confirms the observation by the Supreme Court that "teasing out the difference between taxes and takings is more difficult in theory than in practice." *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2601 (2013). The Court highlighted the "illustrative" case of *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 242 n.2 (2003), where, like here and in *Koontz*, the government "never claimed that they were exercising their power to levy taxes when they took the petitioners' property." *Id.*

[11] In determining whether an assessment is a tax or a regulatory fee, "[t]here is no single test to evaluate the assessment's character," *Thomas v. Network Solutions*, 2 F. Supp. 2d 22, 29 (D.D.C. 1998), *aff'd*, 176 F. 3d 500 (1999), but, given the Court's assumption, no further discussion of the appropriate test or its application is necessary. The import of this assumption must be noted, however. If the HC Assessment were a tax, the plaintiff contends that this "would not obviate the need for the District to establish *some* nexus between the assessment it has imposed and the purpose that it is intended to serve," although the plaintiff concedes "a looser nexus requirement" would apply. Pl.'s Opp'n at 23 n. 19. In other words, if the HC Assessment were a tax, the plaintiff would have a more difficult burden to show a taking. Indeed, long-standing Supreme Court precedent makes clear that the Fifth Amendment's Takings Clause generally imposes no limitation on the legislature's taxing power, unless "the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation, but a confiscation of property." *Brushaber v. Union Pacific R.R. Co.*, 240 U.S. 1, 24 (1916); *see also Koontz*, 133 S. Ct. at 2600 ("It is beyond dispute that '[t]axes and user fees . . . are not takings.'" (quoting *Brown*, 538 U.S. at 243 n.2 (2003) (Scalia, J., dissenting))). The HC Assessment, as repugnant as this assessment is to the plaintiff's membership, amounts to the collection of only a small percentage of direct gross receipts derived from business in the District, and is not so oppressive or burdensome as to put at risk, or even produce a loss in, business operations for the plaintiff's members. Thus, if the HC Assessment were a valid tax, it would not operate in such a confiscatory manner as to constitute a taking under the Fifth Amendment. *Accord Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992) (describing "confiscatory regulations" as imposing such "limitation[s] so severe" as to prohibit all economically beneficial use of land"); *FCC v. Fla. Power Corp.*, 480 U.S. 245, 254 (1987) (finding that

While agreeing that the HC Assessment is not a tax, the parties vehemently disagree over whether this assessment is a "user fee."  The plaintiff insists that the HC Assessment is a "governmental user fee that fails to bear a sufficient relationship to the value received or fails to provide a fair approximation of the costs of benefits supplied," thereby resulting in an unconstitutional taking.  Compl. ¶ 66.  Indeed, the plaintiff makes the bold assertion that the HC Assessment "'walks, talks, and squawks' exactly like a user fee" because it is called a "user fee" for issuers participating on the D.C. Exchange and "is imposed as a percentage of *actual premiums sold*."  Pl.'s Opp'n at 20 (emphasis in original).  The defendants contest this characterization by pointing out the obvious:  the HC Assessment "cannot constitute a 'user fee' because . . . the assessment applies to health carriers that do not 'use' the D.C. Exchange."  Defs.' Mem. at 18.  The plaintiff concedes as much since the gravamen of their complaint about the HC Assessment is its application to non-participating issuers.  *See* Compl. ¶10 ("In effect, the Emergency Legislation imposes 'user fees' on non-users, i.e., on companies and products that are ineligible for participation on the Exchange and beyond the Authority's power to regulate.").  Indeed, if the HC Assessment were a "user fee," the Challenged Amendment would be superfluous since the Establishment Act already granted the Authority the power to assess such fees.  S*ee* 42 U.S.C. § 18031 (d)(5)(A); D.C. Official Code § 31-3171.03(b)(1); Defs.' Mem. at 18 ("the Council was not of the view that the imposition of an assessment was a user fee because, if it did, it would have had no reason or need to pass the Emergency Act").

The defendants have the more persuasive argument on this particular issue and the Court finds that the HC Assessment is not a "user fee."  The plaintiff's effort to squeeze the HC Assessment into the "user fee" mold has the transparent purpose of triggering the constitutional

FCC regulatory order "does not effect a taking of property under the Fifth Amendment" because "a rate providing for the recovery of fully allocated cost, including the actual cost of capital" is not confiscatory).

analysis applicable to user fees.  Under this standard, the Supreme Court has held that, while the amount of a user fee need not be "precisely calibrated to the use that a party makes of Government services," such a fee is required to be "a 'fair approximation of the cost of benefits supplied.'"  *United States* v. *Sperry Corp.*, 493 U.S. 52, 60 (1989) (quoting *Massachusetts v. United States*, 435 U.S. 444, 463, n.19 (1978)); *id*. at 63 ("a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services").  Resolution of this issue against the plaintiff renders inapplicable the proffered analytical rubric employed in *Sperry* to assess whether a "user fee" amounts to a taking, within the meaning of the Fifth Amendment, but nonetheless does not resolve the plaintiff's takings challenge or the appropriate standard for evaluating this claim.

The defendants eschew any need to undertake a takings analysis if the HC Assessment is not a user fee.  Since this assessment is the "'mere imposition of an obligation to pay money,'" Defs.' Mem. at 19 (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001)), they contend that the plaintiff's claim must fail because "the payment of money is not a taking," *id*.  In support of their contention that the Takings Clause is inapplicable to validly imposed payment obligations when "no *property* is being confiscated by the government," *id*. at 20 (emphasis in original), the defendants rely upon non-binding decisions from appellate courts outside the D.C. Circuit and this District Court, *id*. at 19-20, n.22 (citing *Commonwealth Edison Co.*, 271 F.3d at 1339, n.10; *Kitt v. United States*, 277 F.3d 1330, 1336 (Fed. Cir. 2002); *West Va. CWP Fund v. Stacy*, 671 F.3d 378, 387 (4th Cir. 2011); *McCarthy v. City of Cleveland*, 626 F.3d 280, 285–86 (6th Cir. 2010); *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1054 (11th Cir. 2008); *SRM Chem. Ltd, Co. v. Fed. Mediation & Conciliation Serv.*, 355 F. Supp. 2d 373, 377 (D.D.C. 2005) ("[A] government-imposed obligation to pay money is not

susceptible to a takings analysis."); *BEG Invs., LLC v. Alberti*, No.13-cv-182, 2014 WL

1280261, at *13 (D.D.C. Mar. 31, 2014) (noting "circular and nonsensical" result "[i]f money

payments were considered a taking")).

The plaintiff contests this reading of the law, stating that "numerous binding Supreme

Court and D.C. Circuit cases readily refute" the defendants' position that a government-imposed

obligation to pay money cannot be a taking. Pl.'s Opp'n at 21. Nevertheless, the plaintiff

hedges its position by noting that "even if a monetary exaction did have to burden a particular

piece of property, this case, like *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586

(2013), involves such a situation—the monetary exaction burdens the insurance licenses of

ACLI's members, which are subject to revocation if an insurer does not pay the fee." *Id*. at 22

n.17.[12] Likewise, the defendants hedge their position by also arguing that the HC Assessment

would withstand scrutiny under the Takings Clause because "here the assessments imposed on

---

[12] The plaintiff raises this argument only in a footnote in its opposition. The D.C. Circuit has instructed that "the court generally declines to consider an argument if a party buries it in a footnote and raises it only in a conclusory fashion." *Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, No. 12-1228, 2014 WL 5393871, at *9 (D.C. Cir. Oct. 24, 2014) (citing *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014)). In any event, although the plaintiff briefly mentions that the authorized penalties for failure to pay the HC Assessment includes a potential risk to its members' business licenses, this reference is not in connection with the plaintiff's Takings Clause claim but only proffered as evidence of irreparable harm in support of the plaintiff's requests for injunctive relief. *See, e.g.*, Compl. ¶ 57; Pl.'s P.I. Mem., at 15-16, ECF No. 11; Pl.'s Reply in Support of Mot. for Prelim. Inj., at 10 n.3, ECF No. 29; Pl.'s Emerg. P.I. Mem., ¶ 5, ECF No. 32. Indeed, no concern over the risk posed to a member's business license was expressed in either declaration submitted by the representative of one of the plaintiff's members. *See generally*, Decl. of Theresa Patterson ("Patterson Decl."), ECF No. 28-1; Supp. Declaration of Theresa Patterson ("Supp. Patterson Decl."), ECF No. 30-1. Given that the suspension or revocation of insurance licenses is only a potential penalty among the myriad of discretionary options that the Mayor is authorized to exercise, *see* D.C. Code § 31-1204(b) (authorizing Mayor, "in the Mayor's discretion," to take whatever actions "the Mayor deems appropriate, including suspending or revoking the insurer's . . . certificate of authority or license to transact business"), and that no such penalty has been imposed, the risk to the plaintiff's members' licenses is highly speculative, not ripe and therefore insufficient to support a Takings Clause claim. *See San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 346-347 (2005) ("'a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" (quoting *Williamson Cnty Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985)); *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 294-95 (1981) ("constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary") (collecting cases).

health insurance companies doing business in the district is 'reasonably related' to the benefits of the D.C. Exchange under the ACA." Defs.' Mem. at 21.[13]

The parties' dispute over the standard applicable to analyzing the HC Assessment under the Takings Clause is not just skilled litigation posturing but stems from the difficulties in sorting through the muddle of what commentators have called "famously incoherent" and "a mess" of Takings Clause jurisprudence. Steven A. Haskins, *Closing the* Dolan *Deal—Bridging the Legislative/Adjudicative Divide*, 38 URB. LAW 487, 487 (Summer 2006) (internal quotations and citations omitted). The Supreme Court's recent decision in *Koontz* provides general guidance on three analytical rubrics applicable to judicial review of Takings Clause challenges to different forms of government action.[14] First, if the government "directly seize[s]" a tangible property interest, such as real property or an easement or lien, then "it would have committed a *per se* taking." *Koontz*, 133 S. Ct. at 2598-99; *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) ("The paradigmatic taking requiring just compensation is a direct government

_____

[13] The plaintiff seems to concur that its Takings Clause claim should be evaluated, as the defendants suggest, under the "reasonably related" standard, indicating that the same standard applies to its takings, equal protection and due process claims. Pl.'s Opp'n at 22 ("bedrock due process and equal protection principles impose the same nexus requirement on assessments directed at a subset of the population as the Takings Clause"). At the same time, the plaintiff does not explain precisely what the difference is, if any, between the "reasonably related" standard and the standard it also articulates as applicable, namely "a meaningful nexus between the fee imposed and the benefits supplied in return," *id.* at 21; *id.* at 25, such that the benefit to the plaintiff's members are not "vastly out of proportion" to the cost of the HC Assessment, *id.* at 27.

[14] The Ninth Circuit recently "enter[ed] the doctrinal thicket of the Supreme Court's regulatory takings jurisprudence," and discerned "three 'relatively narrow categories' of regulations which work a categorical, or per se, taking:" "the first category . . . holds that permanent physical invasions of real property work a per se taking. The second . . . teaches that regulations depriving owners of all economically beneficial use of their real property also work a per se taking. The third line of cases, represented by *Nollan* and *Dolan*, articulate a more nuanced rule [and] hold that a condition on the grant of a land use permit requiring the forfeiture of a property right constitutes a taking unless the condition (1) bears a sufficient nexus with and (2) is roughly proportional to the specific interest the government seeks to protect through the permitting process. If those two conditions are met, then the imposition of the conditional exaction is not a taking." *Horne v. USDA*, 750 F.3d 1128, 1138-41 (9th Cir. 2014). Two other Judges on this Court have also helpfully outlined the discernable analytical rubrics used in Takings Clause cases. *See Perry Capital LLC v. Lew*, Nos. 13-1025, 13-1053, 12-1439, 13-1288, 2014 U.S. Dist. LEXIS 138066, at * 81-97 (D.D.C. Sept. 30, 2014) (Lamberth, J.). *Ascom Hasler Mailing Sys. v. United States Postal Serv.*, 815 F. Supp. 2d 148, 172-173 (D.D.C. 2011) (Friedman, J.); *Foggy Bottom Ass'n v. D.C. Office of Planning*, 441 F. Supp. 2d 84, 88-89 (D.D.C. 2011) (Friedman, J.).

appropriation or physical invasion of private property."); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982) ("[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve.").

Second, if the government does not directly seize property and instead conditions the receipt of a government benefit on the relinquishment of a property interest, another form of *per se* taking may occur. The Supreme Court explained that "the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation." *Koontz*, 133 S. Ct. at 2594. In such cases, the condition of "just compensation" set out in the Takings Clause is met—and no takings violation arises—"so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Koontz*, 133 S. Ct. at 2595 (citing *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994) and *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837 (1987)). On the other hand, when the government requires the relinquishment of a property interest in exchange for a discretionary government benefit, which "lack[s] an essential nexus and rough proportionality to" the property taken, a *per se* violation of the Takings Clause occurs. *Koontz*, 133 S. Ct. at 2600 (identifying the "central concern of *Nollan* and *Dolan*" as "the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property").

The second analytical rubric is not limited to protecting only real property under the Takings Clause. The *Koontz* Court held that the same "*per se* takings approach" articulated in *Dolan* and *Nollan* "is the proper mode of analysis," "when the government commands the

relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property." *Id*. at 2600-01 (citing *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 235 (2003) (holding that State Supreme Court's seizure of the interest on client funds held in escrow account was a taking); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) (holding that a county's taking of interest on an interpleader fund violated the Fifth Amendment); *see also Perry Capital LLC v. Lew*, Nos. 13-1025, 13-1053, 12-1439, 13-1288, 2014 U.S. Dist. LEXIS 138066, at *88-89 n.54 (D.D.C. Sept. 30, 2014) (Lamberth, J.).

Short of a *per se* taking, the *Koontz* Court also identified a third analytical rubric that applies to "a regulatory taking." *Koontz*, at 2600. Determining whether a regulatory taking has occurred "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Brown*, 538 U.S. at 234. "To constitute a regulatory taking, the [g]overnment action must (1) affect a property interest and (2) go 'too far' in so doing (*i.e.* amount to a deprivation of all or most economic use or a permanent physical invasion of property)." *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011); *Ascom Hasler Mailing Sys. v. United States Postal Serv*., 885 F. Supp. 2d 156, 193-194 (D.D.C. 2012). The Supreme Court has set out three factors to consider whether the regulation has gone "too far:" (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action," particularly "whether it amounts to a physical invasion" or appropriation of property or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *see also Full Value Advisors, LLC v. SEC*, 633 F.3d at 1109; *Lingle*, 544 U.S. at 538-40. "[T]he *Penn Central*

inquiry turns in large part . . . upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540; *id.* at 539 (noting that each of the *Penn Central* factors "has given rise to vexing subsidiary questions" but "have served as the principal guidelines for resolving regulatory takings claims that do not fall within physical takings").

Significantly for this case, the *Koontz* Court expressly declined to address whether "the government can commit a regulatory taking by directing someone to spend money." *Koontz*, 133 S. Ct. at 2600. Describing "*Penn Central's* essentially ad hoc, factual inquir[y]" as "difficult and uncertain," the *Koontz* Court refused to "extend" that rule "to the vast category of cases in which someone believes that a regulation is too costly." *Id.* (alterations in original) (internal quotations and citations omitted). Thus, the majority of the *Koontz* Court left intact the plurality view reflected in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), where Justice Kennedy, in concurrence, joined with four dissenters (Justices Stevens, Souter, Ginsberg and Breyer) "in arguing that the Takings Clause does not apply to government-imposed financial obligations that 'd[o] not operate upon or alter an identified property interest." *Koontz*, at 2599 (citing *Eastern Enterprises*, 524 U.S. at 540 (Kennedy, J., concurring in judgment and dissenting in part) and at 554-556 (Breyer, J., dissenting)); *id.* at 2603-04 (Kagan, J., dissenting) ("*Eastern Enterprises* . . . held that the government may impose ordinary financial obligations without triggering the Takings Clause's protections.").[15] The *Koontz* Court distinguished *Eastern Enterprises* because in *Koontz* "the monetary obligation burdened petitioner's ownership of a specific parcel of land." *Koontz*, 133 S. Ct. at 2599; *id.* at 2600 (emphasizing that "[t]he fulcrum this case turns on is the

_____

[15] In *Eastern Enterprises*, the Supreme Court struck down a statute that retroactively imposed on a former mining company an obligation to pay for the medical benefits of retired miners and their families, with a four-Justice plurality concluding that the statute violated the Takings Clause and Justice Kennedy concurring in the result on Due Process, rather than Takings Clause, grounds. 524 U.S. at 529-37.

direct link between the government's demand and a specific parcel of real property"); *id*. at 2603 (summarizing *Koontz* holding that government's demand for money "from a land-use permit applicant must satisfy the requirements of *Nollan* and *Dolan* even when the government denies the permit"). Indeed, the *Koontz* Court stated that "[t]his case therefore does not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners." *Id*. at 2600.

Even though the *Koontz* majority stressed throughout its opinion that the linkage between the monetary exaction and real property was critical to triggering the *Dolan/Nollan per se* takings analysis, this emphasis was confusingly undermined by the majority's footnote stating that "this case does not implicate the question whether monetary exactions must be tied to a particular parcel of land in order to constitute a taking." *Id*. at 2600 n.2. Consequently, the dissent cautioned that "[t]he boundaries of the majority's new rule are uncertain." *Id.* at 2604 (Kagan, J., dissenting). These are the boundaries tested in the instant case, where the HC Assessment is a monetary exaction that is not linked either to any real estate parcel or other "specific, identifiable property interest."

Given that *Koontz* did not alter the majority view of the Supreme Court, as reflected by the plurality in *Eastern Enterprises*, however, the defendants, again, have the more persuasive argument that a general monetary exaction does not qualify as "a specific, identifiable property interest," *Koontz*, 133 S. Ct. at 2600, to serve as a predicate for a takings claim. *See Commonwealth Edison Co.*, 271 F.3d at 1338-39, n.10 ("although a minority of the Supreme Court has urged that a taking can occur when Congress has imposed an obligation to pay money . . . five justices of the Supreme Court in *Eastern Enterprises* agreed that regulatory actions requiring the payment of money are not takings [and] [w]e agree with the prevailing view that

we are obligated to follow the views of that majority.") (collecting cases). Accordingly, the second count of the Complaint alleging a violation of the Takings Clause fails to state a claim for which relief can be granted.

In any event, even if the HC Assessment "could be viewed as the first step in a 'regulatory taking,'" *Brown*, 538 U.S. at 234, the plaintiff's claim would still fail to state a cognizable cause of action.[16] The Supreme Court's evaluation of a takings claim predicated on the allegation, similar to the plaintiff's here, that a regulation imposes an excessive or unfair burden is evaluated under the *Penn Central* factors. The first factor in this analysis of whether a regulation has gone "too far" requires consideration of the economic impact of the regulation on the plaintiff's members. In this regard, the HC Assessment is not so burdensome as to deny the plaintiff's members a "reasonable rate of return," *see Penn Central*, 438 U.S. at 136 (focusing on the ability to earn a reasonable rate of return), or make the plaintiff's members' insurance business in the District unprofitable, *see Dist. Intown Properties Ltd. P'ship v. D.C.*, 198 F.3d 874, 884 (D.C. Cir. 1999) (rejecting takings claim and noting that mere loss of value "is irrelevant to whether the property as a whole can be operated at a sufficient profit even with the regulation"), or commercially impracticable, *see Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495-96 (1987) (looking to whether the regulation makes property owner's coal operation "commercially impracticable"). Thus, consideration of the first factor shows that the HC Assessment has only a minimal economic impact on the plaintiff's members.

With respect to the second *Penn Central* factor, given the highly regulated nature of the insurance industry, the HC Assessment does not interfere with any investment-backed

---

[16] The parties presented no analysis of the HC Assessment as a regulatory taking since the plaintiff contends that the *Dolan/Nollan per se* takings analysis applies and the defendants contend, correctly under current—though somewhat "uncertain"—Supreme Court jurisprudence, that the assessment is not the type of property interest that triggers a Takings Clause claim.

expectations of the plaintiff's members. As the D.C. Circuit explained in *District Intown Properties*, 198 F.3d at 883, "[b]usinesses that operate in an industry with a history of regulation have no reasonable expectation that regulation will not be strengthened to achieve established legislative ends."

Finally, with respect to the final *Penn Central* factor, the nature and purpose of the HC Assessment does not involve any physical invasion of the plaintiff's members' property and is intended to advance the public purpose of extending health insurance to the uninsured in the District. Even the plaintiff concedes that this is a legitimate public purpose. Pl.'s Opp'n at 25 ("[T]he relevant question is not whether funding the Exchange is a rational government objective; of course it is."); P.I. Hr'g 38:4-9 (acknowledging that plaintiff does not dispute the D.C. Exchange provides a public benefit)). Thus, consideration of all three *Penn Central* factors strongly militates against any finding of a regulatory taking.

The conclusion that the HC Assessment is not a regulatory taking is confirmed by the Supreme Court's reasoning in *Brown v. Legal Foundation of Washington*. There, the Court examined the claim that a State court's confiscation of the "interest on lawyers' trust accounts," ("IOLTA"), 538 U.S. at 220, to support legal services for the poor amounted to a taking in violation of the Takings Clause, since that interest otherwise belonged to "the owner of the principal." 538 U.S. at 235. The Supreme Court concluded that, if the IOLTA program were considered a regulatory taking, under the *Penn Central* analysis "it is clear there would be no taking because the transaction had no adverse economic impact on petitioners and did not interfere with any investment-backed expectation." *Id.* at 234.[17] *See also Decatur Liquors, Inc.*

---

[17] While the IOLTA program was not a regulatory taking, the *Brown* Court concluded that it could be a *per se* taking due to the transfer of the beneficial ownership of interest funds from specific, identifiable IOLTA accounts for a public use. *Id.* at 235. Nevertheless, the Court found no compensatory taking occurred, explaining that "[b]ecause

*v. District of Columbia*, 478 F.3d 360, 364 (D.C. Cir. 2007) (rejecting plaintiffs' claim that District's moratorium on sale of certain single containers of beer in part of city constituted an unconstitutional taking because they were not deprived of all economically viable use of their liquor licenses, citing *Mugler v. Kansas*, 123 U.S. 623, 655, 657 (1887), where Supreme Court rejected "a taking claim by a brewery owner whose brewery lost 75% of its value as a result of a state ban on the making of intoxicating liquors other than 'for medical, scientific, and mechanical purposes.'").

In sum, the HC Assessment does not constitute either a *per se* or regulatory taking. Accordingly, the plaintiff's takings claim in Count Two of the Complaint must be dismissed.

## 2.    Due Process Clause Claim

Count III of the Complaint alleges that the HC Assessment "is imposed without regard to whether the underlying product was, or even could be sold on the DC Exchange, and thus without regard to what, if any, benefit the assessed issuer received from the Exchange." Compl. ¶ 72.  Extrapolating from this allegation, the Complaint further claims that the HC Assessment "bears an insufficient relationship to the government's intended purpose of defraying the regulatory and administrative costs of operating the D.C. Exchange" and "therefore violates carriers' right to due process . . ." *Id.* ¶¶ 72-73. Consequently even if the defendants can overcome a Takings Clause challenge, the plaintiff contends that the funding mechanism adopted in the Challenged Amendment runs afoul of the Fifth Amendment's Due Process Clause.[18]  The Court first addresses the appropriate standard for evaluating the plaintiff's due process claim

---

of the way the IOLTA program operates, the compensation due [the plaintiffs] for any taking of their property would be nil" and, consequently, "[t]here was [] no constitutional violation when they were not compensated." *Id.* at 240.
[18] While due process claims are typically analyzed under the Constitution's Fourteenth Amendment, the District of Columbia, which is not a State, is subject to the Due Process Clause of the Fifth Amendment. *See Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009); *Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (2000).

before turning to evaluate the parties' arguments regarding application of this standard to the Challenged Amendment.

### (a) Applicable Standard

The Complaint alludes to the standard for success on the plaintiff's due process claim, stating that "due process requires a sufficient relationship between the target of the fee and the benefit the government seeks to fund." Compl. ¶ 71. The plaintiff explains that this analysis "impose[s] the same nexus requirement on assessments directed at a subset of the population as the Takings Clause." Pl.'s Opp'n at 22. Although somewhat opaque, the plaintiff's proffered standard suggests that a "sufficient relationship" to satisfy the due process clause exists when the assessed organization enjoys a direct benefit from the program funded by a regulatory monetary exaction. By contrast, the defendants argue that the due process claim should be rejected on grounds that "the assessments are rationally related to a legitimate state interest" and "are constitutional unless they are arbitrary or the classification imposed for the assessment bears no reasonable relation to the goal." Defs.' Mem. at 22. The defendants' articulation of the appropriate standard is much closer to the mark.

The Due Process Clause of the Fifth Amendment protects citizens against deprivation of "life, liberty, or property without due process of law." U.S. CONST. amend. V. The Fifth Amendment's application is therefore limited to those cases where "the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Ralls Corp. v. Comm. on Foreign Inv. In U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)). The plaintiff makes clear that its due process challenge to the HC Assessment is substantive rather than procedural.[19] The plaintiff urges that the HC Assessment

---

[19] The plaintiff explains that "the point is not that [the plaintiff] was denied an opportunity to participate in the process through which the District arrived at its misguided solution. No amount of process allows the government

is susceptible to a substantive due process challenge because the assessment is charged against the plaintiff and its members without providing a commensurate corresponding benefit. Whether the plaintiff's members are benefitted by the Challenged Amendment, however, is simply not the appropriate test to apply in evaluating the sufficiency of the substantive due process claim. The law is clear that "[a]bsent a suspect classification or infringement of a fundamental interest," the Due Process Clause "requires only a rational basis." *AFGE v. United States*, 330 F.3d 513, 523 (D.C. Cir. 2003) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *Waters v. Rumsfeld*, 320 F.3d 265, 268 (D.C. Cir. 2003).

Thus, to sustain its substantive due process claim, the plaintiff bears the burden of showing "that there is no 'rational relationship between [the challenged statute] and some legitimate governmental purpose.'" *Gordon v. Holder*, 721 F.3d 638, 656 (D.C. Cir. 2013) (quoting *Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 742 (D.C. Cir. 2011)) (internal bracket language modified); *see also NFIB*, 132 S. Ct. at 2579; *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (Due Process Clause is satisfied if challenged regulation serves "a legitimate legislative purpose furthered by rational means"). "This burden to negative every conceivable basis which might support the law is especially difficult to meet." *Gordon,* 721 F.3d at 656 (internal quotations and citation omitted).

In particular, when the challenged statute or regulation imposes a monetary exaction, any burden on the government "to justify its actions" is "only very slight." *Emory v. United Air Lines, Inc*., 720 F.3d 915, 923 (D.C. Cir. 2013). The Supreme Court has made clear that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on the one complaining of a due process

---

to impose burdens on a few that should be borne by actual users or the public at large." Pl.'s Opp'n at 23 n.18. Thus, the plaintiff concedes any procedural due process challenge.

violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). Courts must decline invitations from litigants burdened by regulatory action "to engage in a higher level of scrutiny than rational basis review allows," *Gordon,* 721 F.3d at 657, and avoid "assess[ing] the wisdom of Congress' chosen scheme," *Usery*, 428 U.S. at 18-19. Under the rational basis standard, "[i]t is enough to say that the Act approaches the problem of cost-spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Id.*; *see also NFIB*, 132 S. Ct. at 2579) (observing that courts "possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices.")

In the face of this well-settled precedent on application of the rational basis standard to economic regulation, the plaintiff heavily relies on three pre-1930 cases in which the Supreme Court invalidated government regulations that imposed monetary assessments on a select portion of the population. *See* Pl.'s Opp'n at 22 (citing *Norwood v. Baker*, 172 U.S. 269 (1898); *Myles Salt Co. v. Bd. of Comm'rs of Iberia & St. Mary Drainage Dist.*, 239 U.S. 478 (1916), and *Road Improvement Dist. No. 1 of Franklin Cnty., Ark. V. Mo. Pac. R. Co.*, 274 U.S. 188 (1927)). As the defendants point out, the plaintiff's attempt to "return to the days when the Supreme Court struck down legislation on substantive due process grounds" is unavailing—and for good reason. *See* Defs.' Reply at 16.

Over one-hundred years ago, in *Lochner v. New York*, 198 U.S. 45, 52-53 (1905), the Supreme Court applied a strict level of scrutiny to strike down a state regulation on substantive

due process grounds, finding that the wage and hour restrictions at issue violated the employees'

right to "liberty."   The approach used by the Court in *Lochner* to scrutinize government

economic regulation has been firmly rejected in favor of upholding government economic

regulations so long as they meet a "rational basis" standard of review.   *See* Adam Winkler, *Fatal*

*in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59

VAND. L. REV. 793, 798 (2006) (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144

(1938); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937); and *W. Coast Hotel Co. v.*

*Parrish*, 300 U.S. 379 (1937) as "the three cases that overturned *Lochner*").   There is no question

that the Supreme Court has "held for many years (logically or not) that the 'liberties' protected

by Substantive Due Process do not include economic liberties."   *Stop the Beach Renourishment,*

*Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) (citing *Lincoln Fed. Labor Union*

*v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536 (1949)); *cf. Hettinga v. United States*, 677

F.3d 471, 481-83 (D.C. Cir. 2012) (Brown, J., concurring) (discussing the benefits of the

*Lochner*-era protections of economic liberties and indicating disagreement with the move away

from these principles because "[r]ational basis review means property is at the mercy of the

pillagers"), *cert. denied*, 133 S. Ct. 860 (2013).[20]

---

[20] Another Judge concurring in the *per curiam* opinion in *Hettinga v. United States*, declined to join in Judge Brown's concurring opinion, citing "the Supreme Court's long-standing approach to claims of economic liberty" and this "broad area of the Supreme Court's settled jurisprudence." 677 F.3d at 483 (Griffith, J., concurring). Nonetheless, commentators have noted a trend in Supreme Court jurisprudence to rely on the Takings Clause, as opposed to the discredited substantive due process doctrine, to provide greater judicial scrutiny of government regulation. *See, e.g.*, Eduardo Moisés Peñalver, *Regulatory Takings*, 104 COLUM. L. REV. 2182, 2194 n. 52 (2004) (noting that "several commentators have compared the Court's regulatory takings jurisprudence to the pre-*Lochner* doctrine of economic substantive due process") (collecting law review article citations); Dan Herber, Comment, *Surviving the View Through the Lochner Looking Glass: Tahoe-Sierra and the Case for Upholding Development Moratoria*, 86 MINN. L. REV. 913, 941 (2002) ("[S]ome argue that the broad conception of the Takings Clause that Justice Scalia and a majority of the current Court have adopted embodies a strict form of substantive due process reminiscent of the Lochner era." (internal citation omitted)); *see also Dolan v. City of Tigard*, 512 U.S. 374, 406-07 (1994) (Stevens, J., dissenting) ("The so-called 'regulatory takings' doctrine. . . has an obvious kinship with the line of substantive due process cases that *Lochner* exemplified.").

With the applicable standard of review settled, the Court next considers whether the plaintiff has met its burden of establishing that "there is not any reasonable conceivable state of facts that could provide a rational basis for the" Challenged Amendment. *Hettinga*, 677 F.3d at 479 (internal quotations and citation omitted); *see also Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2082 (2012) ("burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it") (quotations and citations omitted).

### (b) Rational Relationship Between HC Assessment and Legislative Purposes

When assessing a rational relationship between a challenged legislative action and a legitimate governmental purpose, the court is not "restricted to the stated reasons for passing a law," *Gordon v. Holder*, 721 F.3d at 657, but may discern such purpose from the text of the statute or reasons provided post-enactment. Indeed, "a legislature need not actually articulate at any time the purpose or rationale supporting its classification." *Armour*, 132 S.Ct. at 2082. In this case, as noted, the Establishment Act speaks for itself in outlining the purposes of this law to "[e]nable individuals and small employers to find affordable and easier-to-understand health insurance;" "[f]acilitate the purchase and sale of qualified health plans;" "[r]educe the number of uninsured;" and "[a]ssist individuals and groups to access programs, premium assistance tax credits, and cost-sharing reductions." Establishment Act, D.C. Code § 31-3171.02.

To withstand a substantive due process challenge, economic legislation "must meet the test [of] a legitimate legislative purpose furthered by rational means." *Gen. Motors Corp.*, 503 U.S. at 191. In this case, the Challenged Amendment authorizing the HC Assessment was not an arbitrary choice but resulted from a survey of funding options compiled and analyzed by the Working Group, at the request of the Authority, which sought to fulfill its statutory mandate of ensuring adequate funds for the D.C. Exchange. *See* Compl. ¶ 45. The Working Group rejected

approaches that would have assessed hospital revenue, increased general taxes or limited funding sources to those issuers offering plans on the D.C. Exchange. Pl.'s P.I. Mot., Schlueter Decl., Ex. E ("Pl.'s P.I. Mot. Ex. E") at 2, ECF No. 11-6.[21]  A funding option to assess only participating issuers would have required double-digit percentage assessments on participating issuers in 2015 and resulted in a concomitant increase in costs for those seeking insurance on the D.C. Exchange and the consequent adverse effect on the affordability of such insurance plans in the year that federal funding ceases. *Id*. at 4, 12.[22]  These results would have undermined the goals of both the ACA and the Establishment Act to expand health insurance coverage to uninsured and make such insurance more affordable for both individuals and small businesses. *See* Defs.' Mem. at 23 ("[s]uch an approach would have added significantly to the cost of the policies available to enrollees, and thus defeat a primary purpose of the ACA.").  Instead, the Working Group unanimously recommended that "if additional revenue is required, [it] should be raised from an assessment on all health insurance premiums written in the District."  Pl.'s P.I. Mot., Ex. E at 1; Compl. ¶ 45.  The Challenged Amendment authorizing the Authority to impose the HC Assessment reflects this recommendation and imposes a small assessment on health insurance

---

[21] Although matters outside the pleadings generally must be excluded when evaluating the sufficiency of a Complaint on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts may review materials referenced in the Complaint, particularly where, as here, the plaintiff has presented the document to the Court in support of its claims. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (noting court may consider, on motion to dismiss, "facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice" (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006))); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) (concluding court could properly consider, on motion to dismiss, chapter of Personnel Manual and "various letters and materials produced in the course of plaintiff's discharge proceedings" attached to plaintiff's opposition that were "referred to in the complaint and [were] central to plaintiff's claims" without converting motion to summary judgment); *Corporate Sys. Res. v. Wash. Metro. Area Transit Auth*., No. 13-1258, 2014 U.S. Dist. LEXIS 39020, at *10-11 (D.D.C. Mar. 25, 2014) (in considering Rule 12(b)(6) motion, court considered contracts referenced in complaint).

[22] The plaintiff indicates that "the District's funding problem was a temporary one of its own creation." Pl.'s Opp'n at 9; *id*. at 10 ("the funding problem the Exchange faces is plainly a temporary one of the District's own making"). This argument is immaterial since the focus of rational basis review is not whether policy-makers in the District could have performed better but whether the legislative choice made bears a reasonable relationship to the policy goal.

issuers generating significant revenues from operations in the District to further the purposes of the D.C. Exchange. As one health insurance provider acknowledged, ensuring all District residents have health insurance will "stabiliz[e] the risk pool, reduc[e] health care costs, and eliminat[e] uncompensated losses." Defs.' Mem. at 24 (citing Letter, dated March 28, 2014, from Laurie G. Kuiper, Senior Director, Government Relations, Kaiser Foundation Health Plan of Mid-Atlantic States, Inc., to Mary Beth Senkewicz of the Authority).

In sum, the Challenged Amendment reflects a considered, and not an arbitrary, choice by the District that is rationally related to, and intended to further the goals of, the ACA and the Establishment Act to facilitate access to affordable health insurance for underserved District residents and small businesses.

In addition to meeting the low substantive due process threshold reflected in the rational basis standard, the defendants go further to proffer multiple ways in which the continued operations of the D.C. Exchange funded by the HC Assessment benefits even non-participating assessed issuers. *See* Defs.' Reply at 9-13. For example, the defendants proffer, first, that "the Exchange creates direct and clear benefits for carriers of supplemental insurance, which include some of the companies in [plaintiff's] membership" because increasing the availability of affordable major medical insurance plans will advance the market for supplemental insurance. *See id.* at 10. More affordable major medical plans for small employers, for example, may enable such employers to offer benefits to employees that include both major and supplemental medical benefits and thereby provide a competitive advantage for businesses within this jurisdiction. *Id.* at 11 (the D.C. Exchange may "free up resource[s] to be redistributed towards supplemental health plans" offered by employers). These "free[d] up resources" may, in turn,

increase the business of plaintiff's members that sell such supplemental insurance products. *Id.*[23]

The defendants further point out that certain excepted benefit products, such as hospital indemnity coverage, cannot be sold to individuals who do not already have major medical insurance, which the D.C. Exchange provides. *See* Defs.' Mem. at 21.

Second, the D.C. Exchange creates a healthier population by providing affordable minimum essential health insurance. This healthier D.C. population may directly benefit issuers of supplemental insurance products because "numerous supplemental benefit plans pay claims upon the onset of a disability or upon death, which may be avoided in the case of a disability, or in either case have a later onset after more premiums [have] incurred." Defs.' Reply at 12. Relatedly, the D.C. Exchange not only increases coverage but also offers more comprehensive coverage which, according to the defendants, could reduce the cost to issuers of certain supplemental products offered by the plaintiff's members, such as long-term care. *Id.*

Finally, by creating another marketplace for major medical plans, the D.C. Exchange enhances competition, which in turn lowers prices and enables consumers to save money that could be used to buy supplemental health products offered by the plaintiff and its members. *Id.* at 13.

The plaintiff rejects the likelihood of these anticipated benefits because they "simply do not extend to the vast majority of non-participating issuers and products" subject to the HC Assessment, Pl.'s Opp'n at 26, and are purely "speculative," *id.* at 27. Even if the defendants "got it wrong," however, and none of the anticipated benefits to the assessed issuers come to fruition, this is not the applicable test for a substantive due process violation and does not warrant striking down the Challenged Amendment as unconstitutional. As Judge Mikva

---

[23] The defendants note, for example, that Unum, the company that the plaintiff relied upon to establish organizational standing in this matter, only offers products through employers. *See* Defs.' Reply at 11 n.11.

explained over thirty years ago, "[u]ndoubtedly, the political process sometimes gets it wrong, but the Constitution presumes that, as long as the groups involved have a fair chance to fight in the political arena, the democratic process will right itself. Legislatures may change flawed laws, or voters may even 'throw the bums out.'" *Beach Commc'n, Inc. v. FCC*, 959 F.2d 975, 988 (D.C. Cir. 1992) (Mikva, J. concurring); *see also Beach Commc'n*, 508 U.S. at 320 ("The assumptions underlying these rationales may be erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immunize' the congressional choice from constitutional challenge."); *Vance v. Bradley*, 440 U.S. 93, 97 (1979) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.").

All that is required to pass constitutional muster, under the Fifth Amendment's Due Process Clause, is a non-arbitrary, rational relationship between the Challenged Amendment and the purpose of operating the D.C. Exchange. This standard is clearly met. Therefore, the Court will not second-guess the legislature to find a substantive due process violation. The fact that assessments are charged to non-participating health issuers deriving significant revenues from the District is simply not enough to impugn this rational relationship. *See Ass'n of Bituminous Contrs. v. Apfel*, 156 F.3d 1246, 1256 (D.C. Cir. 1998) ("legislation need not burden the most responsible party to survive rational basis review"). Thus, the plaintiff has failed to carry the requisite burden to sustain its substantive due process challenge and this claim in Count III of the Complaint is, therefore, dismissed.

### 3. Equal Protection Clause Claim

Count IV of the Complaint alleges that the Challenged Amendment "creates an unreasonable classification that is not rationally related to the District's objective" by "impos[ing the HC Assessment] on certain D.C. businesses without regard to whether the products they sell are, or even could be, sold on the D.C. Exchange" when this assessment "is not imposed on other similarly situated businesses in the District that cannot sell their products on the D.C. Exchange." Compl. ¶ 76. According to the plaintiff, this "violates carriers' right to equal protection . . . ." *Id.* ¶ 77. The defendants counter that "[b]ecause there is a rational relationship between the assessment and the legitimate governmental purpose of maintaining the D.C. Exchange, [the plaintiff] does not—and cannot—come close to meeting" its burden of establishing an equal protection violation. Defs.' Mem. at 26. The defendants are correct.

Under the equal protection clause, "no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).[24] The law is well-established that "'a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Armour*, 132 S. Ct. at 2080 (quoting *Heller v. Doe*, 509 U.S. 312-20 (1993)). Under the rational basis standard, "legislatures may single out classes of people as long as the lines drawn are not 'invidious or

[24] The Fourteenth Amendment's Equal Protection Clause, by its terms, applies only to the States, but the Fifth Amendment's due process clause is applicable to the District of Columbia and "has been construed to incorporate a guarantee of equal protection of the law." *United States v. Jackson*, 553 F.2d 109, 120 n.19 (D.C. Cir. 1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954); *Davis v. Washington*, 512 F.2d 956, 957-58 n.2 (1975) *rev'd on other grounds*, 426 U.S. 229 (1976); *Von Stauffenberg v. District Unemployment Compensation Board*, 459 F.2d 1128, 1130 n.5 (1972)); *see also Dixon v. District of Columbia*, 666 F.3d at 1339 (noting that "the Equal Protection Clause of the Fourteenth Amendment applies to the District of Columbia through the Due Process Clause of the Fifth Amendment").

irrational.'" *Beach Commc'ns, Inc.*, 959 F.2d at 988 (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 176 (1980)). In other words, "'if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.'" *Dixon*, 666 F.3d at 1342 (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)) (brackets omitted).

This case involves neither a suspect class entitled to special scrutiny nor a fundamental right. Instead, the Challenged Amendment merely imposes a monetary exaction against all health insurance issuers generating significant revenues from their operations in the District. The plaintiff's equal protection claim is based on the differential treatment of assessed issuers from other "businesses in the District that cannot sell their products on the D.C. Exchange," Compl. ¶ 76, but, at base, this difference affects only a purely economic interest. As the D.C. Circuit explained, "the equal protection component of the Fifth Amendment's Due Process Clause does not require that all persons everywhere be treated alike. Instead, it imposes the rather more modest requirement that government not treat similarly situated individuals differently without a rational basis." *Noble v. United States Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (internal citations omitted). Indeed, "it is inherent in the nature of regulation that some people and businesses will be treated differently from others." *Decatur Liquors, Inc.*, 478 F.3d at 363 (rejecting as "insubstantial" plaintiffs' equal protection challenge to District's moratorium on sales of certain forms of beer containers in single ward of the city). Consequently, the plaintiff's argument that "[c]ountless retailers, restaurants, and other companies" share the same benefit "from a healthier workforce" as the plaintiff's members but are not subject to the HC Assessment, is unavailing. Pl.'s Opp'n at 27-28. The plaintiff's complaint about the Challenged Amendment's "underinclusiveness is not a basis for invalidating it, because under rational basis

review Congress may choose to proceed 'one step at a time,' applying remedies to 'one phase of one field [while] . . . neglecting the others.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 685 (D.C. Cir. 2008) (quoting *Williamson v. Lee Optical of Okla., Inc*., 348 U.S. 483, 489, (1955); *see also Gordon*, 721 F.3d at 656 ("Courts must uphold legislation '[e]ven if the classification involved . . . is to some extent both underinclusive and overinclusive . . . .'" (quoting *Vance v. Bradley*, 440 U.S. 93, 108 (1979))).

Despite the plaintiff's protestations about the unfairness resulting from imposition of the HC Assessment on its members, the Challenged Amendment is subject to the same "highly deferential rational basis standard" of review applicable to the due process clause claim, and "the District's policy . . . is entitled to a presumption of rationality." *Dixon*, 666 F.3d at 1342. The Court scrutinizes the classification "only to determine the existence of 'some relevance to the purpose for which the classification is made.'" *United States v. Jackson*, 553 F.2d 109, 120 (D.C. Cir. 1976) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966)); *see id*. ("the statute here in issue must be upheld if there is a rational basis for the scheme it creates"); *Calloway v. District of Columbia*, 216 F.3d 1, 6 (D.C. Cir. 2000) ("Most laws will survive equal protection challenge if they bear a rational relationship to a legitimate governmental purpose."). Moreover, "at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin v. Sec'y of Health and Human Servs*., 28 F.3d 1218, 1222 (D.C. Cir. 1994)). The plaintiff has not met this burden here.

The burden is particularly onerous for the plaintiff in this case since, as noted in the discussion of the plaintiff's substantive due process claim, courts "grant statutes involving

economic policy a 'strong presumption of validity.'" *Hettinga*, 677 F.3d at 478-479 (quoting *Beach Commc'ns, Inc*., 508 U.S. at 314). When "ordinary commercial transactions' are at issue, rational basis review requires deference to reasonable underlying legislative judgments," *United States v. Carolene Products Co.*, 304 U.S. 144, 152 (1938), since States "enjoy[] wide regulatory latitude" over "commercial matters," *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 431 (2010); *see also City of Cleburne*, 473 U.S. at 439-40. Thus, "[n]ot only should economic legislation be upheld as long as the classifications drawn in the statute are reasonable in light of its purpose, but the justification for the legislation need not appear in the legislative or administrative record." *Beach Commc'ns, Inc.*, 959 F.2d at 989 (internal quotations and citations omitted).

Courts have recognized that the legislature is often left "striv[ing] for the best possible outcome under the circumstances . . . [b]ecause the only alternative would be to discourage legislators from making even an attempt to address complicated social and economic problems." *Beach Commc'ns, Inc.*, 959 F.2d at 988 (emphasis omitted). Indeed, when "social and economic policy" is at stake, "a statutory classification" should be upheld "against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313-14. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Dixon*, 666 F.3d at 1342 (internal quotations and citations omitted). The Supreme Court has cautioned that "judicial intervention is generally unwarranted no matter how unwisely we may think a political branch acted . . . absent . . . antipathy" because it is assumed that the political process will eventually rectify an unwise political decision. *Beach Commc'ns*, 508 U.S. at 313. The rational basis standard does not require perfect or even close alignment between public purposes and the

regulatory burdens imposed. Rather, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321. "The Constitution is a blueprint for a workable government, and 'we must remember,' as Justice Holmes wrote, 'that the machinery of government would not work if it were not allowed a little play in its joints.'" *Beach Commc'ns*, 959 F.2d at 988 (quoting *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501 (1931)).

The plaintiff may indeed be correct that a better fit exists but this is not sufficient to "overcome the presumption of rationality that applies to government classifications." *Dixon*, 666 F.3d at 1342 (internal quotations and citation omitted). As ample post-*Lochner* era precedent counsels, the courts should not—and this Court will not—second-guess a legislature's policy choice, if supported by any conceivable set of facts, absent a showing that the choice made burdens protected classes or rights. That is the mandate of rational basis review. Set against these principles and in view of the defendants' plausible justifications for assessing the HC Assessment against non-participating health insurance issuers generating significant revenue in the District, *see, infra*, Part III.B.2(b), the HC Assessment survives the plaintiff's equal protection challenge. This claim in Count IV of the Complaint is, therefore, dismissed.

### 4. Non-Delegation Doctrine Claim

In Count V of the Complaint, the plaintiff alleges that the Challenged Amendment granting the Authority the power to impose the HC Assessment "unlawfully and unconstitutionally delegates to the Authority an arbitrary and unlimited legislative power," in violation of the United States Constitution and the D.C. Home Rule Act. Compl. ¶¶ 80-81. In support of this claim, the plaintiff makes two arguments: first, the Authority's power to charge the assessment cannot be checked by a political process, since the plaintiff's members "are

wholly outside the Authority's regulatory ambit," *see* Pl.'s Opp'n at 31; and, second, the

Challenged Amendment does not provide the Authority with intelligible standards to apply in

exercising its discretion to impose the HC Assessment, *id.*  Both arguments are unavailing and

do not save the plaintiff's last claim.

At the outset, the parties do not dispute that legislation enacted by the District is subject

to the non-delegation doctrine inherent in the tripartite structure and terms of the United States

Constitution.  *See* U.S. CONST. art I, § 1 (providing that "[a]ll legislative Powers herein granted

shall be vested in a Congress of the United States").  "Through the Home Rule Act, Congress

delegated some, but not all, of its Article I 'exclusive' legislative authority over the District of

Columbia to the D.C. Council."  *Marijuana Policy Project v. United States*, 304 F.3d 82, 84

(D.C. Cir. 2002).  The District's Charter created "the familiar tripartite structure of government

for the District" and "by its own statutory enactment, the Council has explicitly declared that it

'recognizes the principle of separation of powers in the structure of the District of Columbia

government.'"  D.C. Code § 1-227.1(b) (1992).  The District of Columbia Self-Government and

Governmental Reorganization Act, Pub. L. No. 93-198 (1973) (codified, as amended, at D.C.

Code Ann. § 1-201.01 *et seq.*), empowers the D.C. Council to exercise legislative authority over

"all rightful subjects of legislation" on Congress' behalf.[25]  D.C. Code § 1-203.02; *see id.* § 1-

204.04.  The D.C. Court of Appeals has concluded that "it is reasonable to infer from this

tripartite structure and the vesting of the respective 'power' in each branch that the same general

principles should govern the exercise of such power in the District Charter as are applicable to

the three branches of government at the federal level."  *Wilson v. Kelly*, 615 A.2d 229, 231-232

(D.C. 1992).  The D.C. Council concurs in this view, "explicitly declar[ing] that it 'recognizes

---

[25] The Home Rule enumerates certain subjects that are not considered "rightful" and the Council may not legislate on those subjects, including imposing a commuter tax on non-residents or authorizing the construction of buildings taller than permitted by the monument restriction.  *See* D.C. Code Ann. § 1-206.02(a)(4), 1-206.02(a)(8).

the principle of separation of powers in the structure of the District of Columbia government.'" *Id.* (quoting D.C. Code § 1-227.1(b) (1992)).

The plaintiff's first argument is that "delegation concerns are at their zenith" in this case because "an agency seeks to exercise power over third parties that have no relationship with or meaningful ability to influence the agency exercising that power." Pl.'s Opp'n at 31. In support of this argument, the plaintiff relies on the seminal case of *McCulloch v. Maryland*, 17 U.S. 316, 428 (1819), where the Supreme Court precluded the State from taxing the bank of the United States, in part, because there was no relationship between the bank and the State to preclude abuse of the taxing power. *McCullough* is inapposite, however, because there is both a rational relationship between charging the HC Assessment against the plaintiff's members, *see supra*, Part III.B.2(b), and a political process for checking the power of the Authority to charge the HC Assessment.

Indeed, the plaintiff concedes that, as the Supreme Court recognized in *McCullough*, the political process "is in general, a sufficient security against erroneous and oppressive taxation," *id.* at 428, but contends that "the Authority has strong incentives to capitulate to the demands of participating issuers that it wants and needs to continue selling their products on the Exchange." Pl.'s Opp'n at 31-32. According to the plaintiff, the Working Group, which recommended implementation of a broad-based HC Assessment rather than raising fees on participating issuers, included representatives from participating issuers that sell products on the Exchange. *See* Pl.'s Opp'n at 9-10 ("[n]otwithstanding the readily available alternatives . . . the Working Group recommended the third option, which allowed the providers who actually participated in the group to decrease their own contributions to the costs of the Exchange . . . by outsourcing these costs to providers who do not and cannot participate on the Exchange") (emphasis omitted).

Even if the plaintiff is correct that the Working Group participants had an incentive to curb the fees assessed on participating issuers by adopting a recommendation for a more broad-based funding mechanism, this is an insufficient basis to hold the Challenged Amendment unconstitutional. While the plaintiff's criticism of the Working Group may have validity, the Challenged Amendment was only enacted after review in the normal, legislative process. As a result, the dynamics animating the Supreme Court's concern in *McCulloch* are not present in the instant action and all that is needed are intelligible standards to overcome the plaintiff's non-delegation challenge.

The plaintiff's second argument is that the District's grant of such broad power to the Authority to impose the HC Assessment through the Establishment Act and the Challenged Amendment amounts to an unconstitutional delegation of legislative authority. Pl.'s Opp'n at 37-39. In evaluating this argument, the Court is mindful that "the test is whether Congress has set forth 'an intelligible principle to which the person or body authorized to act is directed to conform.'" *Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (alterations and internal quotations omitted)); *see Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30 (D.C. Cir. 2008) (same). When "Congress provides an administrative agency with standards guiding its actions such that a court could ascertain whether the will of Congress has been obeyed, no delegation of legislative authority trenching on the principle of separation of powers has occurred." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 218 (1989) (citations and quotations omitted); *see also Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 105 (1946) (It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights

are protected by access to the courts to test the application of the policy in the light of these legislative declarations").

The plaintiff insists that the standards set out in the Establishment Act and the Challenged Amendment are insufficient. Pl.'s Opp'n at 37-39. A finding of excessive delegation of authority is extremely rare, however, given the low threshold that legislation must meet to overcome a non-delegation doctrine claim. *See United States v. Ross*, 778 F. Supp. 2d 13, 26 (D.D.C. 2011) ("[o]nly twice in [the Supreme Court's] history, and not since 1935, has [it] invalidated a statute on the ground of excessive delegation of legislative authority") (citations and quotations omitted). The Supreme Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Mich. Gambling Opposition*, 525 F.3d at 30 (quoting *Am. Trucking Ass'ns*, 531 U.S. at 474-75).

Review of the Establishment Act and the Challenged Amendment reveals sufficient guidance for the Authority's exercise of its discretion in funding the operations of the D.C. Exchange. For example, any money collected in the Fund to operate the Exchange "shall not revert" and is only available for the purpose of funding the D.C. Exchange. D.C. Code § 31-3171.03(c). In addition, the Challenged Amendment provides guidance on the timing and application of the HC Assessment, authorizing the Authority to charge an annual assessment on "each health carrier doing business in the District with direct gross receipts of $50,000 or greater" based on gross receipts from the preceding fiscal year. D.C. Code § 31-3171.03(f)(2). Finally, the Authority's power is further restricted to assess fees only up to the amount necessary to operate the Exchange, stating that "[t]he amount assessed *shall not exceed reasonable projections* regarding the amount necessary to support the operation of the Authority." *Id.*

(emphasis supplied).  The cost of the Exchange is not capped, however, and therefore, no

maximum exists on how much can be assessed each year based on reasonable projections.[26]

Regulations containing similarly broad standards limiting agency charges to the amount

necessary to fund an administrative activity have been upheld in the face of a non-delegation

doctrine challenge.  *See, e.g.*, *Skinner*, 490 U.S. at 215 (finding no fault with Congress granting

power to the Department of Transportation to levy natural gas pipeline user fees in an amount

"sufficient to meet the costs of [administrative] activities [related to the Pipeline Safety Acts] . . .

but at no time shall the aggregate of fees received for any fiscal year . . . exceed 105 percent of

the aggregate of appropriations made for such fiscal year for activities to be funded by such

fees."  (quoting the Consolidated Omnibus Budget Reconciliation Act of 1995 § 7005(d), 49

U.S.C. § 1682a (1982)).  Indeed, even where authorizing statutes provide far less guidance than

that provided in the Challenged Amendment, courts have rejected non-delegation challenges.

For example, in *Lichter v. United States*, 334 U.S. 742, 768 (1948), the Supreme Court upheld a

statute that authorized agencies to collect "excessive profits" paid through wartime Government

contracts even though Congress did not "specify how much profit was too much."  *Am. Trucking*

*Ass'ns*, 531 U.S. 457 at 475 (citing *Lichter*, 334 U.S. at 783).  By contrast to the statute upheld in

in *Lichter*, the Challenged Amendment specifies how much of an assessment would be too much

and caps the amount of the assessment at the amount necessary to fund the operations of the D.C.

[26]The plaintiff points out that, in 2013, the Authority projected annual operating costs in 2014-2016 for the D.C. Exchange to be between $20 and $25 million but that cost estimate has already increased with a projected operating budget for the D.C. Exchange in 2015 of $28.75 million. Pl.'s Prelim Inj. Mem. at 11 (citing Schlueter Decl. Exh. E, D.C. Health Benefit Exchange Authority, Recommendations of the Working Group on Financial Sustainability to the District of Columbia Health Benefit Exchange Authority (May 23, 2013) at 3). Moreover, the plaintiff cites statistics showing that the D.C. Exchange "is the second most expensive in the country," *id.*, and that, by comparison, Vermont's local Exchange is estimated to cost "only $10.6 million—even though it has more than three times as many private enrollees as the District," Pl.'s Reply Mem. Supp. Mot. Prelim. Inj., at 31, ECF No. 24.  The plaintiff's concerns regarding the Authority's management of the D.C. Exchange are legitimate, in view of these growing expense projections, particularly in comparison to other State Exchanges serving substantially greater numbers of enrollees, and these concerns may even raise issues warranting increased oversight, but nevertheless do not amount to a constitutional violation.

Exchange.  Accordingly, the District has provided sufficient guidance to the Authority to avoid a rare finding of an unconstitutional delegation of legislative authority.

**IV.     CONCLUSION**

For the foregoing reasons, the Challenged Amendment authorizing the HC Assessment is neither preempted by the ACA nor an unconstitutional violation of the Takings, Due Process and Equal Protection Clauses, or the non-delegation doctrine.  Accordingly, the defendants' motion to dismiss for failure to state a claim is granted and the plaintiff's motions for preliminary injunctions are denied as moot.

An order consistent with this Memorandum Opinion will be contemporaneously entered.

Date: November 13, 2014

_____
BERYL A. HOWELL
United States District Judge